TURNER *v.* STATE.

Crim. 3993

Opinion delivered July 6, 1936.

*Franz E. Swaty*, for appellant.

*Carl E. Bailey*, Attorney General, and *Guy E. Williams*, Assistant, for appellee.

MEHAFFY, J. The appellant was convicted in the Calhoun Circuit Court of murder in the first degree, and his punishment was fixed at death by electrocution. Motion for new trial was filed, overruled by the court, and the case is here on appeal.

938

W. A. May testified in substance that he lived at Ellisville, Arkansas, was a justice of the peace, and knew the appellant and Mrs. Turner; she lived about 200 yards from appellant's house. There was a blind boy, a little girl, Delma, ten years old, and Dennis, Jr., eight years old; another son, Milvin, but he was in a C C C camp in South Carolina. Mrs. Turner worked in the sewing room at Tinsman, which was five miles from her home. She walked to Tinsman, and on the morning of February 4 appellant came to witness' house about sunrise and desired that witness assist him in searching for Mrs. Turner. He helped in the search, and picked up her track on the road that goes to Leverett, and lost her track there. Appellant was with witness, also Rush Chamber, Charlie Smith, Vesta Watson, Curtis Aycock, and Cotton Smith. Witness called Vesta Watson, and said her track played out there, and said he saw a man's track there—about a number ten shoe. Witness then told Vesta that the woman was in the woods, and Vesta found her on a mound. The appellant, Charlie, and Cotton Smith, were on the west side. The body was found on the east side. She was dead. She had been knocked in the head and her jaws were broken. There was a wire around her neck, which showed evidence of having been twisted. There were bruises on her hip and shoulder. The death occurred in Calhoun county, and witness thought the wire around her neck caused her death. The death occurred on February 3. Witness does not know who put the wire around her neck. Mrs. Turner disappeared about two hundred yards from the railroad, which tramps frequently walk up and down.

Vesta Watson testified that he lived in Ellisville, and had known Mrs. Turner during her lifetime; found her dead in the woods of Calhoun county, February 4, 1936. This witness' testimony was substantially the same as that of May as to the tracks and wire, but he did not know who put the wire around her neck and did not know whose tracks the man's tracks were.

H. R. Chambers, who was also in the searching party, testified to substantially the same facts as May and Watson.

Larkin Furlow, the coroner, testified that they found two sets of tracks on the road; one a woman's, the other a man's. It looked like there had been a struggle. Where the woman's track played out, the man's appeared in the ditch. Made a careful examination of the man's tracks and measured them. Looked at appellant's shoe and they looked exactly like the imprint of the tracks on the road. The shoe appellant had on compared with the tracks made in the mud. Did not know who had the shoe on or who put the wire around Mrs. Turner's neck.

Cotton Smith, a cousin of appellant, testified substantially the same with reference to the tracks and wire.

Henry Farneld testified that he lived in El Dorado, was on the police force and was present when appellant made a statement. The statement was free and voluntary. There were no threats or promises, no influence or compulsion.

The confession of appellant was here introduced without objection. Appellant stated in the confession that he put the wire around her neck and took her to where the body was found; that when he put the wire around her neck he made a couple of twists, right quick; that she was standing up when he did this and that he laid her down and left; did not think she was dead when he left her; got the wire off the fence when he left the house that morning; he intended to kill her when he got up, and went down and waited for her to come along; he knew she would travel that road and knew about the time she would go. The confession is quite long, but it is unnecessary to set it out in full.

The coroner testified that appellant was in the mayor's office when his statement was made; that there were no threats, no lash exhibited, and appellant's hands were not put through the cell bars up high and thrust through the outside and handcuffed. Witness does not know what he underwent before he got to El Dorado; did not keep him up all night and question him until he made a confession; he did not ask for food or water; witness did not advise him that if he made a confession it would be used against him, nor did any one else in

his presence. Mr. Stevens read the confession over to appellant before he made his mark. When the confession was made they walked into the mayor's office, and the appellant said: "Well, Alvin, I guess you will burn me up," and Alvin said: "Dennis, I don't promise you anything." Appellant then sat down and said: "I know I am going to the chair." None of the police department made any threats to him, and they wrote up the confession about 4:30 in the morning. Appellant gave his confession while he ate, and told about what was written in the confession.

Barney Southall testified that he was a member of the police force and present when appellant made the confession; that it was made freely and voluntarily without promises or duress. Witness advised appellant that his confession would be used against him.

Frip Hill testified that he, Parker and Stevens took appellant to Little Rock, and returned Thursday. At appellant's home witness found some wire with a peculiar twist on it, and the wire was here introduced. Witness compared tracks in the field and in the land, and they compared identically. Mr. Stevens wrote the statement down as appellant talked, and when it was finished he signed by making his mark. The statement was given freely and voluntarily. They took appellant to Mr. Pitcock, chief of police at Little Rock, but witness does not know whether he made any statement to Mr. Pitcock.

Sell Parker, sheriff of Calhoun county, knew both appellant and his wife; investigated the murder; May held the inquest; he arrested appellant and took him to El Dorado for safekeeping and then took him to Little Rock before Mr. Pitcock, but a confession was not obtained. He was later returned to El Dorado for further questioning. Appellant was at the scene of the murder when witness arrived.

Delma Turner testified that she was the daughter of Dennis Turner and was eleven years old; that her mother was killed on February 3, 1936; her father came to her mother's house Sunday morning and asked her to marry him, but her mother refused and he said he would kill her if she did not; the morning her mother was killed

her father said she could have killed herself, been killed by somebody, or died on the road somewhere. Her father cried when her mother was found dead. She does not know who killed her mother.

L. E. Wagmon testified that he knew both the appellant and his wife and arrived at the scene of the murder about an hour and a half after they found the body; saw the tracks, but does not know who made them, and does not know anything about who killed Mrs. Turner.

The appellant testified that he lived at Ellisville, near where his wife lived; does not know when she was killed, but remembers she was missing that night; went to Tinsman to inquire about her, and next morning went to see Mr. May, and a searching party was formed, and they proceeded to track her to the place where her body was found; appellant assisted in the search; he had not asked his wife to marry him since she had him arrested; they took him to Little Rock where he was questioned by Mr. Pitcock; that night Mr. Hill and Mr. Stevens had him brought out and they questioned him again; later Pitcock questioned him about three hours; he asked Mr. Stevens if he could smoke a cigarette after he was brought into the mayor's office, and Stevens said: "Hell, no, you don't get a damn thing," and witness said: "O. K." He testified that he was put in a cell way back where one not well acquainted with the place would never have found him; they told him there would be no smoking, eating or drinking until he came clean; they brought out a lash about three feet long and about four fingers wide; it had a handle on the end of it; was made of leather, and there were some holes in the lower end; there was fringe on that part about six or seven inches long, and witness testified that Stevens said: "This will get it. This gets it when everything else fails." He then testified about somebody looking out and saying: "Don't let them come in here." After they kept that up a while they took him out of the chair and put handcuffs on him and had him sit down again; that they put him back in the cell, handcuffed his arms through the bars, and they were high up and were two bars be-

tween his arms; they left him in that condition and locked the door. They questioned him while he was fastened up, and he stayed there until he thought he would die, and Henry Farneld asked what he wanted, and witness said he wanted loose, he was nearly dead, and Farneld said: "Are you ready now to tell the truth?" and witness said: "Yes, just let me down." Farneld took the handcuffs off and told him to lay down on the bunk. He testified that he did not murder his wife, and did not know who did it; that the confession was not a voluntary confession; that they got it by putting his hands through the bars with two bars between his hands, and leaving him that way and punishing him; that he did not ask his wife to marry him; did not try to stay at his wife's house when she did not want him; did not tell the children she might have been murdered, died on the road, or committed suicide. Witness cannot read or write, and when asked by the prosecuting attorney to sign the confession, he did not know what was in it, and stated that he did not make numbers of the statements in the confession.

The appellant contends first that the court erred in permitting the State to introduce in evidence the confession of the appellant. He contends that the confession was not voluntarily made, but threats of harm, promises of favor, and show of violence caused the defendant to confess, and that the confession, to be proper evidence, must have been voluntarily made.

We have set out the evidence on this question above, and it will be noted that the several witnesses testified that the confession was voluntarily made, that there were no threats, and no improper methods used to obtain the confession. When proof showed to the satisfaction of the court that the confession was voluntary, then the confession was properly submitted to the jury. The court determines the admissibility of the evidence, and the jury determines its weight and the credibility of the witnesses. Much is left to the discretion of the trial judge in determining the question of admissibility. It is true that the appellant himself testified that the confession was not voluntary. He testified before the

jury and his evidence was considered, together with all the other evidence on the question, and the jury found against him. The confession was introduced without objection.

"Where incompetent evidence is offered, it is the duty of the party to object immediately, or at least within a reasonable time. If he fails to object at the time, and afterwards asks for the exclusion of the incompetent evidence, he cannot demand its exclusion as a matter of right, but the request addresses itself to the discretion of the court. A party cannot speculate upon what the testimony of the witnesses will be, and then at the end of the trial demand as a matter of right that the incompetent testimony be excluded." *Howell* v. *State*, 180 Ark. 241, 22 S. W. (2d) 47; *Bell* v. *State*, 120 Ark. 530, 180 S. W. 186.

Appellant cites and relies on § 3414 of Crawford & Moses' Digest, which reads as follows: "In all cases appealed from the circuit courts of this State to the Supreme Court, or prosecuted in the Supreme Court upon writs of error, where the appellant has been convicted in the lower court of a capital offense, all errors of the lower court prejudicial to the rights of the appellant shall be heard and considered by the Supreme Court whether exceptions were saved in the lower court or not; and if the Supreme Court finds that any prejudicial error was committed by the trial court in the trial of any case in which a conviction of capital offense resulted, such cause shall be reversed and remanded for a new trial, or the judgment modified at the discretion of the court."

This section has been construed many times by this court, and, while the appellant does not have to save exceptions, he does have to make objections, and here no objection was made.

The Supreme Court reviews errors of the circuit court, but before it can consider an error of the circuit court as to the admission or rejection of evidence, objection must be made in the trial court, and this is true in capital cases as well as others.

In construing the statute above set out, this court said: "The Supreme Court of this State has appellate

jurisdiction only, except it may issue writs of *quo warranto* to the circuit judges and chancellors and to officers of political corporations when the question involved is the legal existence of such corporations. * * * As to the admission of evidence in a trial, a question as to its admissibility or competency must be presented to the circuit court by objection or otherwise for decision, before it can err as to its admission, and the same is true as to the law of the case. No exception to such decision is necessary, under the Act of 1909, to present to this court for review, neither is a motion for new trial in cases in which the defendants have been convicted of capital offenses. But it must appear that the decision was made, before we can find that the court erred." *Harding* v. *State,* 94 Ark. 65, 126 S. W. 90; *Alexander* v. *State,* 103 Ark. 505, 147 S. W. 477; *Howell* v. *State, supra.*

Appellant next contends that the court erred in permitting the prosecuting attorney to continually lead witnesses, and make prejudicial remarks. No objection was made to this, and the authorities above referred to settle this question.

Appellant contends that the court erred in permitting such great weight being given to circumstantial evidence, without proper instructions on such evidence. No request was made for instructions, other than those given by the court, and it appears that the court fully and fairly instructed the jury, and that no objections to instructions were made.

Where the State relies on circumstantial evidence alone, the circumstances must be such as to exclude every other reasonable hypothesis, but the guilt of the accused; but in this case the State did not rely wholly upon circumstantial evidence. The attorney for the appellant did not try the case in the court below, and, of course, is not responsible for the condition of the record.

It is next contended that the evidence is not sufficient to justify a verdict of murder in the first degree, and that, therefore, the punishment is excessive. If the appellant committed the crime at all, there can be no question as to his being guilty of murder in the first degree.

If the evidence is to be believed, not only the evidence of witnesses, but the confession of the appellant, the appellant murdered his wife by putting a wire around her neck and twisting it so as to cause her death. Whether the evidence is true or not was a question for the jury. The credibility of the witnesses was also a question for the jury.

We find no error, and the judgment is affirmed.