JAMES AYERS *v.* STATE OF ARKANSAS

5430                                 444 S. W. 2d 695

Opinion delivered September 22, 1969

*Wootton, Land & Matthews,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston,* and *Mike Wilson,* Asst. Attys. Gen., for appellee.

J. FRED JONES, Justice. James Ayers was convicted of negligent homicide on circumstantial evidence in the Hot Springs Municipal Court and was sentenced to one year in the county jail. His conviction was affirmed on appeal to the Garland County Circuit Court and he has appealed to this court, relying on the following points for reversal:

"The court erred in overruling defendant's motion to dismiss as the state's violation of criminal procedure had substantive effect.

The court erred in overruling the defendant's motion to exclude evidence including the blood test and other evidence solicited by the police officer from the defendant while in police custody.

The court erroneously permitted the arresting officer, George Riggs, to testify as to his conclusion as to the point of impact.

The court erroneously overruled the defendant's motion for judgment at the conclusion of the state's case.

When the trial court proceeds from clarification to development of the state's case, at that point the court becomes an advocate and at that point reversible error has been committed.

Reasonable hypotheses were not excluded and the conviction of the defendant was, therefore, at best, a guess."

Since we must reverse on appellant's fourth and sixth points, we shall not discuss the others.

The record reveals the following facts: About midnight on December 19, 1968, a 1963 Thunderbird automobile, being driven by Ayers, collided with a 1954 Pontiac automobile being driven by E. G. Beckwith. Both drivers were taken to a hospital in Hot Springs, but Beckwith was dead upon arrival. Ayers was charged with negligent homicide under Ark. Stat. Ann. § 75-1001 (Repl. 1957) which provides in part as follows:

"(a) When the death of any person ensues within one [1] year as a proximate result of injury received by the driving of any vehicle in reckless or wanton disregard of the safety of others, the person so operating such vehicle shall be guilty of negligent homicide."

The record is not as clear as it might have been as to the exact location of the scene of the collision in relation to the city limits of Hot Springs, but it occurred in Garland County apparently on a two-lane section of new Highway 70 leading east from Hot Springs toward Lonsdale, Benton and Little Rock. From the exhibited photographs of the scene of the collision, the highway is plainly marked by a double stripe painted in the center of the blacktop pavement dividing the two traffic lanes from each other and by a single stripe along the outside edge of each traffic lane, dividing it from the gravel shoulder of the highway.

There is considerable difference in the rules of evidence pertaining to criminal prosecutions as distinguished from civil actions. In a criminal prosecution, the accused remains innocent until proven guilty and the entire burden of proof rests on the state to prove the accused guilty beyond a reasonable doubt. In civil actions, the greater weight, or preponderance of the evidence, rule applies. Circumstantial evidence, as well as direct evidence, comes within the same rule.

In Nichols, Applied Evidence, vol. 2, §§ 11, 13 and 24, at pages 1066-1069, the differences in the rule as applied to criminal and civil cases are well pointed out, as follows:

(In criminal prosecutions).

"§ 11. . . . In order to sustain a conviction based solely on circumstantial evidence, the circumstances must be consistent with the guilt of the accused and inconsistent with his innocence, and incapable of explanation on any other reasonable hypotheses than that of guilt. When the circumstances are of such a character as to fairly permit an inference consistent with innocence, they cannot be regarded as sufficient to support a conviction. Where circumstantial evidence is relied on for a conviction, it is

not sufficient that it raises a mere suspicion of guilt, but it must establish facts inconsistent with innocence. This rule as to the sufficiency of circumstantial evidence to sustain a conviction is applicable to misdemeanors as well as felonies.

§ 13. . . . To warrant a conviction on circumstantial evidence alone, the same degree of certainty is required as where the evidence is direct, namely, the evidence must satisfy the jury beyond a reasonable doubt.

(In civil cases).

§ 24. . . . Circumstantial evidence in a civil case need not rise to that degree of certainty which excludes every reasonable conclusion other than the one arrived at by the jury. Circumstantial evidence in a civil case need only produce moral certainty in an unprejudiced mind; and where it furnishes support for plaintiff's theory, and tends to exclude any other theory, it is sufficient to support a verdict for him. Where plaintiff's case rests on circumstantial evidence, the circumstances must not only be consistent with his theory, but, when weighed with the opposing evidence, must have more convincing force substantiating the theory contended for, from which theory it results that the greater probability is in favor of the party upon whom the burden rests. When rights of parties depend on conflicting testimony, there is often as much evidentiary weight in lack of circumstances as in positive proof.''

In 20 Am. Jur., § 1217, Circumstantial Evidence, at page 1069 is found the following:

''Where circumstantial evidence is relied upon in a criminal prosecution, proof of a few facts or a multitude of facts all consistent with the supposition of guilt is not sufficient to warrant a verdict of

guilty. In order to convict a person upon circumstantial evidence, it is necessary not only that the circumstances all concur to show that the prisoner committed the crime and be consistent with the hypotheses of guilt, since that is to be compared with all the facts proved, but that they be inconsistent with any other rational conclusion and exclude every other reasonable theory or hypothesis except that of guilt. The facts proved must be consistent with each other and with the main fact sought to be proved. A reasonable doubt must be resolved in favor of the accused where a fact or circumstance is susceptible of two interpretations. If the circumstances tending to show the guilt of the accused are as consistent with his innocence as with his guilt, they are insufficient. In order to convict a person of a crime, the facts must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence.''

This court has on more than one occasion stated the rule on circumstantial evidence in criminal cases to be, as follows:

"[W]here circumstantial evidence alone is relied upon to establish guilt of one charged with a crime, such evidence must exclude every other reasonable hypothesis but the guilt of the accused." *Turner* v. *State*, 192 Ark. 937, 96 S. W. 2d 455; *Logi* v. *State*, 153 Ark. 317, 240 S. W. 400; *Jones* v. *State*, 246 Ark. 1057, 441 S. W. 2d 458.

"A conviction resting upon evidence which fails to come up to the standard prescribed by law is contrary to law, and it is the duty of the court to set aside the verdict." *Logi* v. *State, supra.*

With this rule in mind, and viewing the evidence in the light most favorable to the state, we now examine the evidence for a determination of whether there was

any substantial evidence that Mr. Beckwith's death was the proximate result of Mr. Ayers driving his vehicle in a reckless or wanton disregard for the safety of others.

It was stipulated that chemical tests revealed that both drivers, the deceased and the appellant, had 0.15 per cent by weight, of alcohol in their blood upon examination at the hospital following the collision. In connection with the offense of driving under the influence of alcohol, Ark. Stat. Ann. § 75-1031.1 (A) (3) (Supp. 1967) provides:

"If there was at that time 0.15 percent or more by weight of alcohol in the defendant's blood, urine, breath or other bodily substance, it shall be presumed that the defendant was under the influence of intoxicating liquor."

The stipulation as to chemical analyses and the statutory presumption speak with equal force for both drivers as to their being under the influence of intoxicating liquor.

No one testified as an eye witness to the collision. The only evidence that either vehicle was being driven in a reckless or wanton disregard of the safety of others, at the time of the collision, was the circumstantial evidence consisting of debris and marks on the pavement, tending to prove that the two automobiles came together with the point of impact being about two feet north of the center line, in the west bound traffic lane of the highway. The physical damage to the left fronts and sides of both automobiles would be circumstances tending to prove that they were traveling in opposite directions at the time of the collision, but the conflicting evidence as to the directions the respective automobiles may have been traveling leaves the hypothesis to be drawn from all the evidence subject to surmise and conjecture. There is no direct evidence as to the direction either automobile was traveling at the time of the collision.

Laura Dawson, a witness for the state, testified that she lived at Benton and that she and Jerry Emory were passengers in the automobile being driven by the appellant at the time of the collision. She testified that they had gone to Little Rock about 8:30 or 9 p.m., earlier in the evening, and that the appellant had driven in a normal manner within the legal speed limits with nothing erratic about his driving, both to and from Little Rock. She testified that she was asleep at the time of the actual collision. Miss Dawson testified under cross-examination, as follows:

"Q. And where were you going on the night of the occasion on the return trip?

A. We was going to Hot Springs.

Q. Were you going anywhere after Hot Springs?

A. Yeah, we was going to Oklahoma."

Under examination by the court Miss Dawson testified that she and the appellant had two or three beers, but she doesn't say when nor where, except that the appellant "had one at the corner, then we had one down at Cliff's." She testified that she does not know what time the collision occurred, that she was asleep and that Emory said he was also asleep at the time of the collision.

Mr. E. H. Bradley testified that he was operating the Darby Service Station on East Grand Avenue in Hot Springs on the night of the collision. He testified that about fifteen or twenty minutes before midnight he observed a white Thunderbird automobile with Oklahoma license at his service station.

"Q. What was the—what did this Thunderbird do that you saw sir?

A. It darted in my driveway and then it never

did pull into the pumps, it pulled back out on the highway and started on east.

Q. Did you notice anything peculiar about the manner in which the car was—

A. It was wobbling.

Q. Did it hit the curb or anything?

A. Yes, sir.

\* \* \*

Q. How many people did you observe in the car, sir?

A. Two in the front. The driver and one girl.

Q. Did you take a very good look at it so you could identify the people in the car?

A. Not positively, no."

Mr. Bradley testified that he later heard an ambulance siren and that about 12 o'clock he closed the service station and drove out the highway to where the collision had occurred. He does not say how far it is from his filling station to the scene of the collision, but he testified that the appellant's Thunderbird automobile looked like the same one he had seen at his filling station. Mr. Bradley testified that he only saw two people, the driver and a girl, in the Thunderbird automobile at his service station, and Mr. Bradley was very positive in his testimony that the girl had blonde hair. Miss Dawson testified that she had dark brown hair on the night of the collision and that she was not wearing a blonde wig.

George Riggs, a trooper with the Arkansas State Police, testified that he was traveling east on the highway and came upon the scene of the collision. In part

of his testimony Trooper Riggs referred to a diagram
he had drawn on a blackboard and this portion of his
testimony is difficult to follow in the record before us.
Trooper Riggs concluded from his investigation, how-
ever, that the appellant was traveling in the east bound
lane, crossed over the center line and collided with the
decedent Beckwith's automobile. There is no evidence
whatever as to where Mr. Beckwith had been or where
he was going at the time of the collision, and there is
no evidence at all, except that deducible from the testi-
mony of Trooper Riggs, that would indicate the direc-
tion Mr. Beckwith was traveling or the traffic lane he
was using at the time of the collision. Considering the
testimony of Trooper Riggs so important to the hypoth-
esis that may reasonably be drawn from all the evidence,
we copy from the record in some detail, as follows:

"Q. Would you tell the court what you found at
this accident?

A. I found a 1963 Thunderbird bearing Okla-
homa license setting kind of on an angle
across the east bound traffic lane and a '54
Pontiac bearing Arkansas license off of the
highway on the north side. There was a—

Q. What highway was this?

A. Highway 70, the new Little Rock highway.
There was a wheel off of the Pontiac laying
in the highway in the west bound lane and
there was a man laying partly on the shoulder
and partly in the west bound traffic lane.
There was heavy debris in the west bound
lane, and drag marks on the dirt from the
Pontiac back up on the highway and a gouge
mark from where the vehicle, where the drag
marks came onto the highway there was a
gouge mark on the blacktop back up into the
west bound lane.

THE COURT:

Q. Is this thing over here a diagram of this situation?

A. Yes, sir.

MR. CALLAHAN:
Yes, sir.

THE COURT:

Who drew it?

A. I did.

THE COURT:

Are you saying this car on the bottom lane is Mr. Ayers' car?

(Trooper Riggs went to the blackboard where there was a drawing on the board)

A. Yes, sir, this vehicle is the Thunderbird and this vehicle No. 2 is the Pontiac.

THE COURT:

Thank you.

A. The drag marks in the dirt from the Pontiac came back up to the highway, the gouge mark came up in the west bound lane to within about 2 feet of the center line. The wheel from the left front of the Pontiac was in the west bound lane and the man was laying face down with his head north on the west bound shoulders. And there was debris scattered from this area all the way down to the other vehicle, to the Thunderbird.

* * *

A. The left front wheel of the Pontiac was knocked off apparently by the impact and the car went down to the pavement and scratched it and that scratch starts about two feet inside the west bound lane and extends to the shoulder where the vehicle when it left the black top dug up the dirt and carried it where it slid to a stop.

* * *

*Questions by the court:*

Q. From the physical evidence and the debris, et cetera, which directions were these cars going?

A. From the way the Pontiac bopped the highway when it went off the Pontiac was traveling west and the Thunderbird east.

* * *

A. . . . in my opinion the evidence at the scene indicated that the Thunderbird was across the center line.

* * *

Q. Now, I will ask you as a matter of fact Mr. Riggs in the majority of accident investigation in which there has been a head-on collision, is it not the ordinary course that the cars end up past each other, that is the majority of investigations?

A. This is not a head-on collision.

Q. This is not a head-on?

A. It's not a direct head-on collision.

Q. It was a glancing blow in your opinion?

A. In my opinion.

THE COURT:

Gentlemen, the pictures show what happened here, let's get on with this case. I don't know what the point of all this is.

MR. MATTHEWS:

Q. As a matter of fact there was some discussion about speeding a minute ago, does not your accident report reveal and so state that if in fact Mr. Ayers' car was traveling in the east bound lane that it was knocked backwards some 132 feet by Mr. Beckwith's car?

A. That's where it was setting.

Q. Well does not your accident report so state?

A. Yes, sir.

Q. That Mr. Beckwith's car knocked Mr. Ayers' car backward some 132 feet and this is without the wheel on?

A. What now?

Q. I believe you said that the left front wheel of Mr. Beckwith's car was knocked off in the accident is that correct?

A. That's right.

Q. Now does this not indicate speed to you on Mr. Beckwith's part if in fact it was the car in the west bound lane?

A. The damage was equally severe to both vehicles.

Q. But as it turned out Mr. Ayers car was knocked back 132 feet, is that not correct? From the approximate place of impact.

A. Yes, it was."

State's exhibit "A" is a picture of the Thunderbird automobile with heavy damage indicating a crushing impact to its left front fender and wheel, with the damage extending back to the left door. State's exhibit "B" is a front view picture of the Pontiac showing extensive damage to the entire left side. The left front fender and wheel appear to have been sheared off or crushed in, from even with the left side of the hood to the rear of the automobile.

State's exhibit "C" and "D" are pictures of the highway apparently looking west. These exhibits show skid, or "gouged" marks and debris from a point where an automobile wheel is lying on the west center line of the highway and leading in a westerly direction across the north shoulder of the highway to where the Pontiac came to rest headed in a northwesterly direction just off the north shoulder of the highway. What appears to be the Thunderbird automobile is shown in exhibit "C" just off the pavement some distance west of where the Pontiac left the highway. In exhibit "D" the Thunderbird is shown to be still on the pavement in the east bound traffic lane, headed in a southeasterly direction, and some distance (132 feet according to Trooper Riggs' testimony) west of where the Pontiac left the highway.

Mr. Beckwith is dead and Mr. Ayers stands convicted in two courts of causing Mr. Beckwith's death by driving his automobile in a negligent or wanton disregard for the safety of others. Mr. Ayers knows whether his drinking and driving killed a man on the highway and the trial court may be, and obviously was, satisfied in his own mind that Mr. Ayers committed a negligent homicide. The question before us, however, is whether

the state proved Mr. Ayers guilty of the crime for which he is charged, under the rules of evidence applicable to circumstantial evidence in a criminal case. We are forced to the conclusion that the state has not met that burden.

The criminal negligence in this case falls most heavily on the driver who crossed the center line of the highway, and the evidence in the record before us would require surmise and conjecture for a determination of which driver crossed the center line.

If the automobile Mr. Bradley saw in his service station was the appellant's automobile, then the appellant would have been driving in the east bound lane if he continued east after leaving the station. If the appellant was on his way from Little Rock to Hot Springs, as Miss Dawson testified he was when the collision occurred, he would have been traveling the west bound lane toward Hot Springs. One version is as good as the other on this point. The girl in the automobile Mr. Bradley saw had blonde hair. Miss Dawson testified that her hair was dark brown and that she was asleep when the collision occurred. Apparently, no one else saw or talked to Miss Dawson or the other passenger, Mr. Emory, on the night of the collision, and apparently no one ever inquired as to where Mr. Beckwith had been or where he was going, or the direction he was traveling when the collision occurred. Trooper Riggs only surmised that Beckwith was traveling west by the gouged marks in the highway.

The physical evidence at the scene of the accident is consistent with most any hypothesis. The appellant could have been traveling west, struck the Pontiac spinning it around and knocking it north and west whatever number of feet it did travel, and this theory would be as consistent, if not more so, than the theory that the Pontiac struck the appellant's automobile a glancing blow in the west bound lane and knocked it almost straight back a distance of 132 feet. The distance the

Pontiac traveled following the impact is not in the record, but it is obvious from State's exhibit "C" that it was nowhere near 132 feet. There were no skid marks made by either automobile prior to impact. We conclude from the record before us that the judgment of the trial court was of necessity based on surmise and conjecture as to the facts, and that the judgment must be reversed.

Reversed.