Timothy Lamont HOWARD *v.* STATE of Arkansas

CR 00-803 79 S.W.3d 273

Supreme Court of Arkansas
Opinion delivered May 9, 2002

[Petition for rehearing denied June 27, 2002*]

---

\* Brown, Thornton, and Hannah, JJ., would grant. Corbin, J., not participating.

*Arkansas Public Defender Commission*, by: *Dorcy Corbin*, for appellant.

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., and *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

W. H. "DUB" ARNOLD, Chief Justice. This appeal, by Timothy Lamont Howard, is from a judgment of conviction for two counts of capital murder and one count of attempted capital murder from Little River County Circuit Court. Howard was sentenced to two death sentences on the two capital murder convictions and a thirty-year sentence plus a $15,000 fine on the attempted capital murder conviction. He appeals on multiple grounds, which include: (1) insufficient evidence to convict Howard of capital murder and attempted capital murder; (2) error by the trial court in allowing the prosecutor to comment on Howard's right not to testify; (3) error by the trial court in allowing untimely exculpatory information provided by the prosecutor; (4) error by the trial court in refusing Howard the opportunity to present to the jury the manner in which the exculpatory evidence was withheld; (5) error by the trial court in allowing hearsay testimony; (6) error by the trial court in refusing to grant Howard's motion to suppress; (7) error by the trial court in allowing improper argument by the prosecutor during closing argument; and (8) error by the trial court in admitting handcuffs purchased by the state into evidence. We conclude that all points raised are without merit, and affirm.

## Background

On Saturday, December 13, 1997 at 10:30 a.m., the police discovered Brian Day's body in the back of a U-Haul truck in Ogden, Arkansas. Brian Day had been beaten and had been shot once in the head with a .38 caliber bullet. Once Brian Day's body was identified, the police went to notify Shannon Day of her husband's death. At the Day home, the police forced their way into the home and found Shannon's dead body in a closet in a bedroom. Trevor Day, the Days' seven-month-old child, was found by the police crying with a cord tied around his neck underneath a pile of cloths in a zipped bag in one of the bedrooms of the Day home.

Appellant Timothy Lamont Howard was arrested on Wednesday, December 17, 1997, for the capital murders of Brian Day and Shannon Day and the attempted capital murder of Trevor Day. Howard had been friends with Brian and Shannon Day for years, and the nature and depth of their friendship was not disputed. Brian Day and Howard sold drugs together, and on the eve of the day the bodies were discovered, Howard expected to receive $4,500.00 from a deal with Brian Day. Additionally, Penny Granger testified at trial that, shortly before the murders, Shannon Day suspected that she was pregnant with Howard's child. However, the most incriminating evidence against Howard was his inappropriate and unexplainable behavior both before and after the discovery of Brian, Shannon, and Trevor Day. During a period of time before and after the bodies were located, Howard relied on three different girlfriends, their homes, and several vehicles interchangeably to plan and to attempt to conceal his crimes. Consequently, Howard's behavior is best understood in a chronological order beginning with the Thursday before the crimes.

On Thursday, December 11, 1997, Howard went with Brian to rent a U-Haul truck. Brian Day revealed conflicting stories regarding the rental of the U-Haul truck. He told one person that he was going to be moving furniture, but he also disclosed that he was going to be receiving stolen merchandise. Howard stated that he was going to help the Days move furniture.

At 3:00 a.m. on Friday, December 12, 1997, Vicki Howard, appellant Howard's ex-wife, left work at Cooper Tire in Texarkana and drove to Ashdown, where she intended to go to Brian and Shannon's house. Before continuing to the Day home, Vicki stopped at a restaurant, at 4:00 a.m., where she sat and spoke with Howard. Howard acknowledged to Vicki that he was upset with the Days because they would not admit to dealing drugs and they allowed others to believe that Howard was the only person dealing drugs and bringing them to Ashdown. Howard also discouraged Vicki from going on to stay overnight with Brian and Shannon Day because they were in a fight. Howard, then, told Vicki that he would rent a hotel room in Texarkana if she would return there. Vicki Howard did rent a room and stayed the night in Texarkana.

Later that same Friday morning, Howard, driving the U-Haul truck, arrived at the motel in which Vicki Howard rented a room. Howard advised Vicki not to tell anyone about the U-Haul because the information would get her killed. Howard left the U-Haul truck parked at the motel, and Vicki drove Howard in her car to a farm which the Howard family owned in Ogden, Arkansas. Once at the farm, Howard drove to a small shack, illuminated it with the headlights of the car and went inside the shack. While in the shack, Howard bent down, picked something up, and put it in one of his pockets. Afterwards, Vicki dropped Howard off at Kim Jones's apartment. Kim Jones was, at that time, Howard's girlfriend, but since the two have been married.

Later that Friday at 5:00 p.m., Howard called Vicki at her motel room in Texarkana. Howard requested Vicki to come pick him up at Kim Jones's apartment. Vicki picked up Howard and they returned to the motel room. Vicki testified that Howard had a camera bag that he said contained "some stuff to have kinky sex" and that he mentioned handcuffs and a rope. Howard then drove Vicki's car to Wal-Mart and returned to the motel with a .38 caliber handgun stuck in the front of his pants. Vicki testified that Howard left the motel room at 9:40 p.m. wearing a black sweatshirt, jeans, and she thought a pair of work boots.

At approximately 11:00 p.m. on Friday, December 12, 1997, Howard called Kim Jones's sister, Jennifer Qualls, with whom he was also involved, and asked Qualls to pick him up at a rest stop on Highway 71 by the Red River Bridge, which is several miles from the Howard family farm. Qualls testified that when she arrived, Howard got out of Kim Jones's car and was acting "weird."

Jennifer Qualls drove appellant Howard to her house and the two went to bed. Howard got up at 1:00 a.m. on that Saturday morning stating he had to go get his money. He returned at approximately 3:00 a.m. and woke Qualls, to tell her that Shannon and Trevor Day would be staying with Qualls while he and Brian went to take care of some business. During the night, Jennifer saw Shannon and heard Trevor crying.

When Jennifer next awoke between 6:30 a.m. and 7:00 a.m. on Saturday, December 13, 1997, no one was in the house. How-

ard arrived at about 7:30 a.m. at Qualls's home and told her that the Days were hiding out and that he was the only person that knew their whereabouts. Further, Howard was the last person seen with Shannon and Trevor Day. Howard also gave Jennifer $200.00 in cash and told her that he needed a ride back out to the rest stop on Highway 71 to pick up Kim Jones's car. On the way to the rest stop, Jennifer noticed a woman's purse and other bags in the back seat of her car. Howard told her that they belonged to Shannon Day. Once at the rest stop, Howard took the purse and the other items from the back seat. Howard also asked Qualls if she thought Robin Jones, one of Qualls's former co-workers, would let him borrow his truck to help Brian and Shannon move furniture.

Jennifer Qualls then returned to her home by herself where she started to get ready to report to work at 9:00 a.m. Howard arrived at her home approximately twenty minutes after she returned home from dropping him off at Kim Jones's car and demanded Robin Jones's truck. Around five minutes after Qualls had reported to work, Howard arrived, asking if she had spoken with Robin Jones about the truck. Qualls called Robin to inquire about the vehicle, and Howard left to obtain the truck from Robin Jones.

Eddie Scroggins, a salesman at Pro-Truck outfitters in Texarkana, testified that Howard came into the store that Saturday morning and paid $140.00 cash for the largest toolbox in stock. Howard told Scroggins that he would have to come back for the toolbox because he was driving a car, and he would have to go get a truck to load the toolbox. Howard did pick up the toolbox a short time later, however, it is not known what vehicle he was driving.

Little River County Sheriff Danny Russell testified that, shortly before 10:00 a.m. on Saturday, December 13, 1997, he received a call that a U-Haul truck was parked in a wooded area in East Ogden. This was only two-and-a-half hours after Howard told Qualls that he was the only person who knew the Days' whereabouts. The dispatcher reported that there was blood dripping from the back of the U-Haul and the back door was pad-

locked shut. Sheriff Russell drove to the scene with lights and sirens on, where he discovered Brian Day's body in the back of the U-Haul truck on a farm owned by the Howard family. Russell called for other police personnel and an ambulance to the scene. The time of death of Brian Day is unknown, but the medical examiner did determine that he had been involved in a struggle and had been shot once in the head with a .38 caliber bullet. There were bloodstains found on a piece of carpet near the U-Haul truck and the position of the leaves on the ground indicated that Brian's body had been dragged to the U-Haul from the small shack on the farm. Investigators found Howard's fingerprints on the U-Haul truck. Also, a passerby found a pair of work boots two miles from the Howard family farm at the corner of Highway 71 and East Ogden Road in a cleared area. The boots found were the same size and type that Howard's ex-wife, Vicki Howard, had bought for him and thought she had seen him in the previous day. There was also a hair found inside the boots that matched Howard's DNA, plus blood on top of the left boot matched Brian Day's DNA.

In his statement to the police, Howard contends that he went looking for Brian Day shortly after borrowing Robin Jones's pickup truck that Saturday morning. When he did not find Brian at his house, he drove toward his family farm in Ogden. Howard stated that police cars passed him on the road toward the farm and that he yielded to a passing ambulance. Howard stated that he knew something was wrong, so he drove Robin Jones's pickup truck back to Texarkana and called Vicki Howard.

Vicki Howard testified that Howard called her at 11:00 a.m. Saturday morning. Howard told Vicki to pick him up in Texarkana. When Vicki arrived, Howard was in Robin Jones's truck and was wearing tennis shoes. Howard handed the truck keys to Vicki and told her to do something with them. He also handed her $120.00 to rent another motel room in Texarkana. After leaving Howard at the motel, Vicki picked up Robin Jones and took him to his truck. Vicki then returned to the motel, picked up Howard, and drove him to Kim Jones's apartment.

In the meantime, after Brian Day's body was identified, the police went to the Day home, where there was no answer. The police then forced their way into the home and found Shannon Day in a closet under a mattress, window frames, and picture frames. Shannon's hands had been handcuffed behind her back with handcuffs that were described at trial by the State as "identical" to the pair that Qualls testified Howard had once purchased from Saks, a Texarkana lingerie store. There was a ligature around her neck, and there were bruises on her body indicating some sort of struggle. The police found Trevor Day inside a zipped bag full of cloths with a cord around his neck, but he was still alive. Howard's fingerprints were also found on a bottle in the Days' living room.

Between 12:30 p.m. and 1:00 p.m. on Saturday afternoon, Howard called Jennifer Qualls at work and informed her that the police had found a dead body in a U-Haul. He stated that he was unsure if it was Brian, but he asked Qualls to clean out her car because the police would probably be wanting to talk with her. Qualls also testified that Howard asked her if she was going to turn him in. Later that afternoon, Qualls discovered the tool box purchased by Howard in her front yard, full of cleaning supplies that had been taken from Qualls's cabinets.

Howard and Kim Jones arrived at Qualls's house shortly after Qualls arrived home from work, and the three of them agreed to leave town. Qualls asked Howard what had happened to Shannon's purse and other belongings, and Howard told her that he had gotten rid of it. Jennifer Qualls testified that, before they left town on Saturday, December 13, 1997, Vicki Howard phoned and told Howard that the police wanted to talk to him, but Howard did not speak with the police at that time. Instead, the three left town, drove to Shreveport, Louisiana, and then spent the night in a motel in New Boston, Texas.

On Sunday afternoon, they returned to Ashdown and gave statements to the police. Howard instructed Jennifer Qualls not to say anything about the money. After Qualls gave the police her statement Howard asked whether she had said anything about the

toolbox. The three returned to Kim Jones's apartment and spent the evening there.

On Monday, December 14, 1997, Jennifer Qualls went to work and was to be back at Kim's home by dark that night. When Qualls did not return, Kim became worried but Howard knowing that Jennifer was staying at the motel that evening told her not to worry. On Tuesday, Howard went there and had sex with Qualls. The next day, Qualls went to the police and spoke with the chief investigator in charge of the Days' murder investigation and made a statement which led to Howard's arrest that day, Wednesday, December 17, 1997.

Within a month of Howard's charge, the defense filed a motion for discovery. In January 1998, the defense was provided a file containing 101 items from the prosecutor. There was also a cover letter that reflected that if any additional information was gathered it would be sent to the defense. In November 1998, the defense learned of the existence of a file at the Ashdown Police Department. Early in the investigation the file had been taken to the prosecutor, but certain items were removed from it and the remainder of the file was returned to the Ashdown Police Department. The defense did not receive this file until February 1999. The file contained witness statements which were given in close proximity to the murders. In all, there were twenty-nine statements previously not provided to the defense. Information supporting the statement that Howard had given the police was in this file. Also, the file contained information concerning supposed drug deals, deals involving Brian Day receiving stolen property, and witnesses who saw Brian arguing with white men about money the week of the murder. Just prior to the April 13, 1999 pretrial motion hearing, one of the police officers found another part of Howard's file in the trunk of his car. That file was given to the defense in April 1999.

From these files, the defense learned, prior to trial, that the night before Brian Day's body was found, Day had spoken with several friends about illegal deals he had going. Brian revealed to some that he was going to be receiving a load of stolen merchandise around midnight from a person he had not dealt with before.

Brian Day was also trying to collect money from several people so he could pay off someone to whom he was indebted. One person gave Brian $800 and a quarter ounce of methamphetamine that night. Shannon Day had expressed fear for their lives because she thought Brian was getting in too deep.

The defense also discovered that, within the month before the murders, a friend of Brian's had introduced him to an individual from Oklahoma, who drove a red, late-1980's model pickup truck and was interested in trading marijuana for methamphetamine. Further, just four days before the murders, Brian Day was seen arguing with two Caucasian men.

The jury trial began on December 6, and concluded on December 9, 1999. At the end of the State's case, and again after the defense rested, Howard moved for a directed verdict for lack of sufficient evidence to convict Howard of capital murder or attempted capital murder. The trial court denied both motions for directed verdict. Howard was convicted on two counts of capital murder and one count of attempted capital murder, and was sentenced to two death sentences and thirty years in the Arkansas Department of Correction plus a $15,000 fine.

### Sufficiency of the Evidence

When a defendant makes a challenge to the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State. *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000); *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998); *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998). It is well settled that a motion for a directed verdict is a challenge to the sufficiency of the evidence. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002); *Smith v. State*, 346 Ark. 48, 55 S.W.3d 251 (2001) (citing *Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995)). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Smith, supra.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other

beyond suspicion or conjecture. *Smith, supra.* Only evidence supporting the verdict will be considered. *Smith, supra.*

 Circumstantial evidence provides the basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Sublett v. State,* 337 Ark. 374, 989 S.W.2d 910 (1999). Such a determination is a question of fact for the fact-finder to determine. *Sheridan v. State,* 313 Ark. 23, 852 S.W.2d 772 (1993). The credibility of witnesses is an issue for the jury and not the court. *Phillips v. State,* 344 Ark. 453, 40 S.W.3d 778 (2001). The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Phillips, supra.* We will disturb the jury's determination only if the evidence did not meet the required standards, thereby leaving the jury to speculation and conjecture in reaching its verdict. *Philips, supra.* When we review a challenge to the sufficiency of the evidence, we will affirm the conviction if there is substantial evidence to support it. *Phillips, supra.* Additionally, the longstanding rule in the use of circumstantial evidence is that the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused to be substantial, and whether it does is a question for the jury. *Gregory v. State,* 341 Ark. 243, 15 S.W.3d 690 (2000).

 The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Chapman v. State,* 343 Ark. 643, 38 S.W.3d 305 (2001); *Bell v. State,* 334 Ark. 285, 973 S.W.2d 806 (1998). We have also held that a defendant's improbable explanation of suspicious circumstances may be admissible as proof of guilt. *Chapman, supra; Goff v. State,* 329 Ark. 513, 953 S.W.2d 38 (1997); *Thomas v. State,* 312 Ark. 158, 847 S.W.2d 695 (1993).

In this case, the State presented both direct physical and circumstantial evidence linking Howard to the murders of Brian and Shannon Day and the attempted murder of Trevor Day. The police discovered Brian Day's body in a U-Haul truck, with Howard's fingerprints, while it was parked on the Howard family farm in Ogden, Arkansas. Earlier that morning, a pair of work

boots were located by a disinterested witness in a cleared area several yards from Highway 71 and about two miles from where Brian Day was discovered. This witness testified that he did not see the boots at 8:30 a.m., but by 8:50 a.m. they were located in the clearing along with footprints leaving the boots going toward a wooded area. The boots were found in a side-by-side position with Brian Day's blood on one of them and a Negroid hair compatible with Howard's DNA inside one of the boots. However, there were also two unidentified Caucasian hairs found inside one of the boots.

Howard argued at trial that the location of the boots indicated that someone deliberately placed the boots so they would be found. Howard also argued that it was impossible for the boots to have been thrown, which the State argued, and land in the side-by-side position in which they were found. Howard further charged that Brian Day's blood, which was located on one of the work boots, was never in contact with the floor mats of the car that Howard had been driving that day. But the boots were the same size and type that Vicki Howard testified Howard may have been wearing the day before. Further, when Vicki saw Howard the next morning, he was wearing tennis shoes and not the boots.

Inside the Day home, where Shannon Day and Trevor Day were discovered, there were fingerprints on a Mountain Dew bottle in the living room that were identified as Howard's. However, there were unidentified fingerprints found on the window frames and picture frames covering Shannon's body. Regardless, there was other substantial circumstantial evidence that connected Howard to the murder of Shannon Day and the attempted murder of Trevor Day which a jury could exclude every other reasonable hypothesis than that of the guilt of Howard.

In addition to the direct physical evidence presented at trial, the jury was presented with substantial circumstantial evidence. Although circumstantial, evidence that an accused was seen in proximity to the scene of a crime, as well as evidence that he offered an improbable explanation of suspicious circumstances, can be evidence of guilt. *Engram, supra.* Furthermore, flight following the commission of an offense is a factor that

may be considered with other evidence in determining probable guilt and may be considered as corroboration of evidence tending to establish guilt. *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001)(Chapman's attempted flight at the scene of the search provides additional evidence of guilt).

Vicki Howard testified at trial that she saw Howard with a .38 caliber handgun and driving the U-Haul truck on the day before the bodies were found. Brian Day was shot in the head with a .38 caliber bullet, and his body was found in the back of the U-Haul truck on Howard's family farm in Ogden, Arkansas.

Further, at 11:00 p.m. on the Friday before the bodies were discovered, Jennifer Qualls testified Howard appeared agitated at a rest stop close to the Howard family farm. Later that same night he awoke from sleep and stated to Qualls that he had to go get his money. Then, on Saturday morning, he was handing out large amounts of cash, for the purchase of the largest toolbox a store had available and for various motel rooms. Furthermore, Howard attempted to explain that he was the only one who knew where the Days were, and that they were hiding out. Moreover, despite driving the U-Haul the day before, Howard was desperate to borrow Robin Jones's pickup truck to help the Days move furniture on that Saturday morning. Howard abandoned that pickup truck once he saw the police had discovered Brian Day's body. Additionally, once he heard about the discovery of the Days, Howard left town. Lastly, he sought to control the information that Jennifer Qualls gave to the police.

Vicki Howard testified that Howard told her that his bag contained objects for kinky sex, including a pair of handcuffs. When the police located the camera bag after the discovery of the bodies, there were no handcuffs in the bag. There was testimony that Howard never used handcuffs with any girlfriend, but Qualls did testify that she saw handcuffs once in Howard's possession.

The jury heard testimony from witness Penny Granger concerning conversations she had with Shannon Day. Granger stated that she saw a positive result from a pregnancy test taken by Shannon and Shannon feared that Howard might be the father of the

child. The credibility of Granger is an issue for the jury and not this court.

Therefore, in addition to the physical evidence linking Howard to the murder of Brian Day and Shannon Day and the attempted murder of Trevor Day, there was circumstantial evidence that Howard was seen in close proximity of the crime scene. Additionally, Howard's flight following the discovery is a factor that may be considered by the jury in determining guilt by the jury.

 We hold that there was sufficient evidence to affirm the denial of the motion for directed verdict.

*Prosecutor's Comments During the Guilt Phase and Penalty Phase*

Howard argues to this court that the prosecutor improperly commented on his right not to testify during both the guilt phase of his trial and, again, during the penalty phase. While being questioned by the defense during the guilt phase, defense witness Kim Jones testified that Howard had asked her to call Vicki Howard and tell Vicki to pick him up. The prosecutor objected to this testimony and without asking to approach the bench, the prosecutor argued in front of the jury:

> I would object to the Defendant saying . . . What the Defendant is saying. . . He can say what he said, but she can't. That's self-serving hearsay.

At that point the defense asked to approach the bench and moved for a mistrial. In response to defense counsel's motion, the trial court stated at the bench:

> . . . I guess you are going to have to be careful about what you say in front of the jury . . . and do not make any improper comment on the Defendant's failure to testify should he fail to testify.

The trial court then denied the defense's motion for a mistrial. Howard argues the mistrial should have been granted because the comment made by the prosecutor violated Howard's right not to testify during trial.

The State asserts that the prosecutor's objection did not constitute an improper comment because there was no direct reference to Howard's decision not to testify. The prosecutor did not suggest that the jury should draw any inferences in the event Howard chose not to testify. The prosecutor made his objection during the defense case, when, for all the jury knew, it was still possible that Howard would take the stand. Furthermore, the State contends that the objection was not a reference to Howard's failure to testify, but rather a hearsay objection.

A mistrial is a drastic remedy, to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial, and when it cannot be cured by an instruction to the jury. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). The decision to grant a mistrial is within the sound discretion of the trial court and will not be overturned absent a showing of abuse or manifest prejudice to the appellant. *Jones, supra*. Prejudice is presumed. *Adams v. State*, 263 Ark. 536, 566 S.W.2d 287 (1978). An abuse of discretion may be manifested by an erroneous interpretation of the law. *Wilburn v. State*, 346 Ark. 137, 56 S.W.3d 365 (2001); *Seeco, Inc. v. Hales*, 334 Ark. 134, 969 S.W.2d 193 (1993).

In this case, the trial court's denial of Howard's motion for a mistrial during the guilt phase was not so prejudicial that justice could not be served by continuing the trial. The decision to deny the mistrial was within the sound discretion of the trial court, and an abuse of this discretion cannot be found. The trial court admonished the prosecutor not to improperly comment on Howard's failure to testify and did not rule that the prosecutor had made such a comment. Therefore, the trial court's ruling to deny the mistrial was correct, and no error can be found.

During the penalty phase of Howard's trial, Howard contends the prosecutor commented on his right not to testify during the State's closing argument. The prosecutor stated:

> Ladies and Gentlemen, the only comment that I guess I would make on the Defendant's witnesses and its testimony, and I listened very carefully and even discussed it with Mr. Cooper. Did

you ever once hear the word of remorse? Did you hear it just once? You've been here for four days. . .

The defense objected to this comment as being an improper comment on Howard's right not to testify. The trial court stated, "Well, I don't know that it is a comment. It might could be reflected or could be reflected, so let's just avoid it." Howard asserts that his convictions were based on minimal circumstantial evidence and the prosecutor's comments as such cannot be deemed harmless.

When an objection to a statement during closing argument is sustained, an appellant has been given all of the relief requested, and, consequently, there is no basis to raise the issue on appeal unless the appellant requests admonition to the jury or a mistrial. *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999). Furthermore, a comment is improper when it draws attention to the fact, or comments on, the defendant's failure to testify. *Jones, supra.*

An allegedly improper comment on the defendant's failure to testify usually occurs during the prosecutor's closing argument, when the evidence is closed and the defendant's opportunity to testify has passed. *Adams, supra.* Under those circumstances, a comment that draws attention to the defendant's failure to testify is improper because it creates the risk that the jury will surmise that the defendant's failure was an admission of guilt. *Adams, supra.* Consequently, the comment has the effect of making the defendant testify against himself in violation of the Fifth Amendment. *Jones, supra.* Under the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, a defendant has the privilege of deciding whether to testify.

Here, Howard did not seek further relief by moving for a mistrial or requesting an admonition to the jury. However, even if Howard had moved for a mistrial or an admonition to the jury, the comment did not refer to Howard's failure to testify. Rather, Howard never expressed remorse to the witnesses that testified, not that he failed to express remorse to the jury.

Therefore, we find no error and affirm the trial court.

*Discovery*

Prior to trial, defense counsel filed a motion alleging that the trial court should dismiss the charges against Howard because the prosecutor did not provide timely exculpatory information. Specifically, Howard argued to the trial court that, while he received information by May 19, 1999, seven months before the beginning of his trial in December, 1999, the delay hindered his investigation of the case and his effort to show that someone else was responsible for the murders of Brian and Shannon Day and the attempted murder of Trevor Day. The trial court denied Howard's motion, finding that the defense had received all of the information before the trial date.

Howard filed his first motion for discovery on January 7, 1998, when the murders were less than one month old. On January 27, 1998, the prosecutor sent Howard a file containing 101 items with a cover letter by the prosecutor stating they would provide Howard with any additional information as provided to the prosecutor.

In November 1998, defense counsel went to the Ashdown Police Department to review photographs concerning the investigation. After a long delay, the defense was told about interviews with nine witnesses who were previously unknown to the defense. Howard argues that these nine statements included valuable information to the defense. The statements included information stating that Brian Day was dealing in stolen merchandise; Brian Day was seen arguing with a Caucasian male about money; Brian Day was dealing with nonlocal people; a new Corvette was seen in the Days' driveway the morning of the murders; and, Brian Day owed someone about $2,000. There was also a part of the Howard file found in the trunk of a police car a couple of weeks before one of the pretrial hearings in the matter. Howard further contends the fingerprint expert, from the crime lab, testified that an anonymous caller requested a particular individual's prints be compared to those prints found on the frames found on Shannon Day's body. A match was never made, but this particular name was never heard nor seen by the defense until this testimony was given at trial, and

there was no documentation of this in the file. Howard contends this failure to provide that information is also prejudicial.

Howard further asserts that this prejudice was compounded by the trial court's ruling that the defense could not explain to the jury how the police investigation had been conducted. The defense's motion to dismiss set forth facts concerning the manner in which the defense received the discovery. At a hearing on this motion, the trial court denied the motion and granted the prosecutor's request to prevent the defense from telling the jury of the piecemeal fashion they had received the information.

 Arkansas Rule of Criminal Procedure 17.1 provides in part:

> (d) Subject to the provisions of Rule 19.4, the prosecuting attorney shall, promptly upon discovering the matter, disclose to defense counsel any material or information within his knowledge, possession, or control, which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce the punishment therefor.

Ark. R. Crim. P. 17.1(d) (2001). The prosecutor must disclose information in sufficient time to permit the defense to make beneficial use of it. *Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000). When error consists of withholding significant evidence which denies the defendant a fair trial, the case will be reversed and remanded. *Strobe v. State*, 296 Ark. 74 (1988). Furthermore, a defendant cannot rely upon discovery as a total substitute for his own investigation. *Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 373 (1998). The choice of an appropriate sanction is within the trial court's discretion. *Reed v. State*, 312 Ark. 82, 847 S.W.2d 34 (1993).

 Here, the information was turned over to Howard when the State was presented with the information or when the State learned of the information. All information was given to Howard seven months before trial. Furthermore, Howard had every opportunity to conduct his own investigation regarding other suspects and other witnesses. Therefore, because Howard had all of the alleged exculpatory information before his trial began, there was no discovery violation. Accordingly, the trial

court did not abuse its discretion by granting the State's motion in preventing Howard from conveying to the jury the piecemeal fashion in which the defense had received such information, nor in denying Howard's motion to dismiss. We, therefore, affirm the trial court.

*Hearsay*

It is well-settled law that hearsay is not acceptable. While there are exceptions to the rule, the testimony in this case does not fit into one of the exceptions. During Jennifer Qualls's testimony, the defense objected to an answer after the answer had been given. The trial court overruled the objection and the testimony resumed. The following is the questioned testimony:

A. I called my mother and I told her I called a friend of mine and they both — I asked them what should I do and they told me I needed to talk with the police, so that Tuesday I had a hard time at work, you know —

Q. Is that what your mother told you? You need to talk to the police?

A. Her and Etonia, my friend, did.

BY MR. CARDER: I'll object to that.

BY MR. COOPER: She'd already answered Judge. There was no objection.

BY THE COURT: Overruled.

Howard contends that this piece of information that Jennifer Qualls's mother and friend told her to speak with the police was so important to the State that it came up again on direct and then again during the State's closing argument. Howard asserts that there is no requirement that an attorney anticipate every word that may be spontaneously uttered by a witness. The State argues that Howard only stated a general objection upon which he cannot now advance his hearsay argument, and, even assuming any hearsay was erroneously admitted, any error was harmless.

Pursuant to Rule 801(c) of the Arkansas Rules of Evidence, "hearsay" is a statement, other than one made by the

declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted; such testimony is inadmissible evidence unless it fits within one of the exceptions outlined in Rule 803. Ark. R. Evid. 801(c) (2001).

A general objection will not preserve a specific point. *Marts v. State*, 332 Ark. 628, 968 S.W.2d 41 (1998). Thus, in order to preserve a hearsay objection, a defendant must make a timely, specific objection, stating that ground. *Hooper v. State*, 311 Ark. 154, 842 S.W.2d 850 (1992). When a question calls for a hearsay answer, the attorney's responsibility is to object at the first opportunity. *Hill v. State*, 285 Ark. 77, 785 S.W.2d 495 (1985).

Here, Howard only stated a general objection upon which he cannot now advance a hearsay argument. But, even assuming Howard made a specific hearsay objection at trial, the trial court did not err in denying the objection because Qualls may testify to hearsay as a basis to explain her actions, such as going to the police. A hearsay statement may be related by a witness to show the basis of action, such as contacting the police. *Mills v. State*, 321 Ark. 621, 906 S.W.2d 674 (1995). Therefore, we affirm the trial court's ruling.

*Motion to Suppress*

Prior to trial, the defense filed a motion with the trial court to prohibit Penny Granger from testifying to a statement that Shannon Day might have been pregnant with Howard's baby. Howard contends that this testimony should not have been admitted because the allegation had never appeared in any other statement made by Granger. Further, there was no evidence that Shannon Day was, in fact, pregnant. The State asserts that the testimony was correctly admitted because it proved a possible motive.

Howard argues that the prejudicial impact of allowing unsubstantiated testimony that Shannon was pregnant was immeasurable. And, to add to this prejudice, testimony was allowed that Howard might have been the father. The defense asserts this testimony is both irrelevant and highly prejudicial, and a proper appli-

cation of Arkansas Rule of Evidence 401 and 403 would have excluded this testimony.

The admission of evidence showing motive is a matter left to the discretion of the trial court which will be reversed only for an abuse of that discretion. *Martin v. State*, 328 Ark. 420, 944 S.W.2d 512 (1997). Where the purpose of evidence is to disclose a motive for killing, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996). Further, the credibility of witnesses is an issue for the jury and not for this court. *Chapman, supra; Marta v. State*, 336 Ark. 67, 983 S.W.2d 921 (1998). Here, the decision of the trial court was well within its sound discretion, and the decision is therefore affirmed.

### Closing Argument

The trial court has a fundamental duty to insure that a defendant's rights are protected and that the defendant receives his constitutionally guaranteed fair trial. Prejudicial remarks by a prosecutor seeking the death penalty should not be tolerated. In this case, during the State's closing argument the prosecutor made the following comment:

> . . . but probably the most horrible, horrible thing that happened in this case, probably the most horrible thing that happened that night was that she watching her seven-month-old child being strangled in front of her. I submit to you ladies and gentlemen, the last thing, the last thing that Shannon Day saw before she died was her seven-month-old baby hanging from an extension cord, that's how she left this world. That's what you are here for today is to determine what the punishment is . . .

Howard argues that there was no evidence that Shannon Day watched her infant being hung from an extension cord. There was not even evidence that the baby was ever hung from an extension cord. These comments were made to inflame the passion of the jury. Howard asserts that since there was no evidence that Shannon Day did in fact watch Trevor Day hanging from an extension cord, it is reasonable to conclude that the thought never

occurred to the jury. The statement by the prosecutor was highly prejudicial, and the court, on its own, should have prevented the prosecutor from making the argument. *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

■ The State argues that Howard did not preserve this issue for appeal because he did not object at the trial-court level. Even constitutional issues may not be raised for the first time on appeal. *Willett v. State*, 322 Ark. 613 91 S.W.2d 937 (1995).

■ The remark did not amount to an error that required a *sua sponte* admonition or mistrial without an objection. Furthermore, the parties are given great leeway in closing argument, and reversible error must show an abuse of discretion by the trial court in permitting that leeway. *Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998). And, the jury was instructed that the closing argument was not evidence.

■ ■ Here, the remark that Shannon Day saw her child hanging from an extension cord before she died is a fair inference from the evidence. Every plausible inference may be argued in closing. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996). It is plausible that Shannon Day watched the attempted murder of Trevor because of the antemortem wounds discovered on Shannon's body. It is not unreasonable to infer Howard would first bind Shannon before causing harm to Trevor, as the State argued. Therefore, we find no error and affirm the trial court.

### Relevant Evidence

The trial court allowed the State to introduce a pair of furry handcuffs which the prosecutor had purchased from Saks, the same store where Howard had purchased similar handcuffs. Over the objection of the defense, the prosecutor argued, in front of the jury, that the handcuffs "are identical to the handcuffs on the victim . . . We've had testimony that the defendant purchased a pair at Saks, this very same place, for Jennifer Qualls." Howard's relevancy objection was overruled. The record is void of any testimony that the handcuffs found on Shannon Day were identical to the handcuffs the prosecutor purchased. No one testified that the handcuffs on Shannon Day belonged to Howard, only that How-

ard told Vicki Howard that he had them. No one testified whether there was glue residue on the handcuffs that were on the victim, and no one testified that traces of fur had been found anywhere.

Howard argued that the State's handcuffs should not have been admitted under Arkansas Rule of Evidence 401 (relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). However, if relevant, it was highly prejudicial and inadmissible pursuant to Ark. R. Evid. 403 (although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence).

The relevancy of evidence under Arkansas Rule of Evidence 401 is a matter of discretion for a trial court, whose determination is entitled to great deference. *Owens v. State*, 313 Ark. 520, 856 S.W.2d 288 (1993). Determinations about the use of demonstrative evidence, like other evidentiary decisions, are also left to the discretion of the trial court and reversed only for an abuse of that discretion. *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995).

Here, the State admitted that it had purchased the handcuffs and they were not the ones used on the victim, nor were they the handcuffs Qualls testified she had seen in Howard's possession. The trial court allowed the State-purchased handcuffs into evidence, but this was not an abuse of its discretion. Therefore we affirm the trial court's order in allowing the handcuffs into evidence, and we further find no error.

*Rule 4-3(h)*

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for adverse rulings objected to by Howard but not argued on appeal and no prejudicial error is found.

In sum, in light of the physical and substantial circumstantial evidence presented to the jury, who determined his guilt and recommended his sentence, we cannot say that the trial committed error in this case. Accordingly, we find no reversible error in the trial court's rulings. We affirm the trial court on all points and Howard's judgment of conviction.

Affirmed.

Special Justice MIKE KINARD joins in this opinion.

BROWN, THORNTON, and HANNAH, JJ., dissent.

CORBIN, J., not participating.

ROBERT L. BROWN, Justice, dissenting. The critical question for this court to resolve is whether the evidence was sufficient to convict Howard for the murder of Shannon Day. I do not believe it was. Surely, it was not forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. See Smith v. State, 346 Ark. 48, 55 S.W.3d 251 (2001). For that reason, I respectfully dissent. I would reverse Howard's convictions for Shannon's murder and Trevor's attempted capital murder and the death sentence as well. I would remand this case for resentencing solely on Howard's conviction for the capital murder of Brian Day.

The proof implicating Howard in Shannon's murder is paper thin. The majority, in fact, says as much when it states that it is relying on Howard's "inappropriate and unexplainable behavior" as the most incriminating evidence against him. Inappropriate and unexplainable behavior, in my mind, is not forceful evidence that would compel a conclusion. The State's evidence consists of a fingerprint on a Mountain Dew bottle in Shannon's living room, the fact that Howard was with Shannon for part of Saturday morning, and various statements that Jennifer Qualls and Vicki Howard attribute to Howard during the relevant time period. Those statements include (1) that Brian and Shannon were hiding out and only Howard knew where they were; (2) that Shannon's purse and bags were in the back of Jennifer's car and he had gotten rid of them; (3) a statement to Jennifer to clean out her car; (4) a question to Jennifer, "Are you going to turn me in?"; and (5) a state-

ment to Vicki that he had handcuffs in his Wal-Mart bag for kinky sex. Shannon was found in handcuffs. This can best be described as an extremely weak circumstantial case.

What is most notable about this case is what is not known. Various pieces of the puzzle are missing, and we are forced to engage in speculation to fill in the gaps. For example, we know next to nothing about the drug deal Brian was involved in Thursday night before the Saturday morning murders. The same is true about Brian's deal involving stolen property scheduled for Friday night. We do know that Brian needed a U-Haul truck to transport *something* but whether it was drugs or stolen property or for some other purpose is totally a mystery based on the record before us. Most importantly, we do not know whom Brian was dealing with in these criminal matters. We do know from Shannon's conversation with a friend that she feared for their lives because Brian was getting in "too deep." There can be no doubt that Brian's criminal activity was integrally connected to the killings.

We also know that Shannon's body was found under picture frames with unidentified fingerprints on them. I agree with Howard that these fingerprints are much more likely to have come from the perpetrator of Shannon's murder than Howard's fingerprint on a Mountain Dew bottle found on a table in her home. By everyone's admission, Howard was a close friend of the Days, and a soft drink bottle with his prints in their home was to be expected.

It is axiomatic under our caselaw, and we cite the principle repeatedly, that if circumstantial evidence is used to provide the basis for a conviction, it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *See, e.g., Price v. State*, 347 Ark. 708, 66 S.W.3d 653 (2002); *Whitfield v. State*, 346 Ark. 43, 56 S.W.3d 357 (2001); *Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000); *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000). Thus, if you have two equally reasonable conclusions as to what occurred, this merely gives rise to a *suspicion* of guilt which is not enough to support a conviction. *Fudge v. State, supra; Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000). As this court recently said:

With respect to the exclusion of every other reasonable hypothesis, Judge Butler, speaking for the court, said in the case of *Bowie v. State*, 185 Ark. 834, 49 S.W.2d 1049 (1932):

> This demands that in a case depending upon circumstantial evidence the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty, and must exclude every other reasonable hypothesis than that of the guilt of the accused. Circumstances, however strong they may be, ought never to coerce the mind of the jury to a conclusion of guilt if they can be reconciled with the theory that one other than the defendant has committed the crime, or that no crime has been committed at all.

*Gregory, supra*, 341 Ark. 243, 15 S.W.3d 690 (2000). In the words of Justice George Rose Smith, "The issue is simple: Was the evidence so evenly balanced that the jury had to resort to guesswork in finding that the crime was committed by [appellant] rather than by someone else?" *Surridge v. State*, 279 Ark. 183, 650 S.W.2d 561 (1983).

I do not believe that there is sufficient evidence to prove Howard killed Shannon and that he tried to kill Trevor. There is simply too much guesswork and speculation involved. I further believe the jury clearly erred in not finding that a reasonable hypothesis existed that a third party killed Shannon, particularly in light of the unknown fingerprints on the picture frames under which Shannon's body was found. Clearly, the fact that sufficient evidence exists to convict Howard for the murder of Brian does not lead inescapably to a conclusion that he also killed Shannon and strangled Trevor or provide sufficient evidence for those offenses.

Because I would affirm Howard's conviction on Brian and reverse his conviction for the murder of Shannon and attempted murder of Trevor, Howard's sentence becomes problematic. At the sentencing phase, the jury found four aggravating circumstances to warrant the death penalty:

> In the commission of the capital murder, Tim Howard knowingly created a great risk of death to a person other than the victim;

> In the commission of the capital murder, Tim Howard knowingly caused the death of Brian Day & Shannon Day in the same criminal episode;
>
> The capital murder was committed for pecuniary gain;
>
> The capital murder was committed in an especially cruel and depraved manner.

No mitigating circumstances were found. All four aggravating circumstances related to the joint murders of Brian and Shannon. Because the two murders were intertwined, and no effort was made to treat the two convictions separately for sentencing purposes, I would remand for resentencing solely on the capital murder of Brian Day.

RAY THORNTON, Justice, dissenting. I agree with Justice Brown's dissent concluding that there was not sufficient evidence to convict appellant of the murder of Shannon Day and the attempted murder of Trevor Day and that appellant's conviction of these charges must be reversed. In addition, I also believe that the evidence to support a conviction for the murder of Brian Day was very thin. Even if the evidence, considered in the light most favorable to the State, was sufficient to submit to the jury the question of appellant's guilt of the murder of Brian Day, the trial was flawed by errors which in my view require a new trial on the charges relating to Brian Day.

As pointed out in Justice Hannah's dissent, I agree that the trial court committed several reversible errors during the trial. First, the trial court erred in allowing Penny Granger to testify that Shannon Day believed that she might be pregnant by appellant. Next, I believe the statement made by the prosecutor in closing argument that the last thing Mrs. Day saw before her death was her baby being hung from an extension cord was so prejudicial and inflammatory, not to mention unsupported by any evidence, that a new trial must be ordered. Also, I find the admission of the handcuffs purchased by the police troublesome. I cannot agree with the majority's reasoning that such flaws do not constitute reversible error.

I am further troubled by the State's last minute responses in producing evidence sought during discovery, and by the State's

reference to appellant's failure to testify. In my view, several reversible errors occurred during the trial.

I am also greatly troubled by the skimpy circumstantial evidence linking appellant to the murder of Brian Day, as analyzed by Justice Hannah's dissent. In my view, even if the minimal amount of evidence is barely sufficient to present the fact question to the jury, the case is deeply flawed by prejudicial errors and I must conclude that a new trial should be ordered for the charge of murdering Brian Day.

In summary, I would reverse and dismiss appellant's convictions for the murder of Shannon Day and the attempted murder of Trevor Day because of insufficiency of the evidence. I would also reverse appellant's conviction for the murder of Brian Day, and remand for a new trial on that charge.

I respectfully dissent.

JIM HANNAH, Justice, dissenting. It is with great reluctance that I must dissent and argue that a jury verdict should be overturned. However, I am compelled to do so because the jury was left to speculation and conjecture which may not support a conviction. The demands of due process are not satisfied by suspicion, speculation, and conjecture.

This case was based entirely upon circumstantial evidence. Circumstantial evidence can certainly constitute substantial evidence and support a jury's verdict. However, requirements must be met that have not been discussed by the majority. Justice Butler in the case of *Bowie v. State*, 185 Ark. 834, 49 S.W.2d 1049 (1932), stated that the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty, and must exclude every other reasonable hypothesis than that of the guilt of the accused. This has always been the standard, and these words have been cited since 1932, and were last cited in 2000. However, it appears that seventy years of precedent is being abandoned. Rather than being presented with substantial evidence or, in other words, evidence forceful enough to compel a conclusion Howard committed the murders and the assault, the jury received credible

evidence of at least two reasonable hypotheses and was left to speculate. Neither hypothesis was supported by substantial evidence.

The jury received evidence that tended to incriminate Howard and evidence that tended to incriminate others with whom Brian was making a drug deal. Evidence was presented that Brian was deeply in debt, that he and his wife feared for their lives, that he had set up a drug deal that took place about the time of the murders at the place where his body was found, that a substantial sum of money was involved, that he was to receive something that required a truck to haul, and that in the days before his murder he had been in confrontation with unidentified persons, who were apparently the persons he met the night of his murder. The jury was also given evidence argued to show that Howard committed the murders and assault, characterized by the majority as the most incriminating because it is "inappropriate and unexplainable." There is no doubt that the evidence offered made Howard a suspect. The problem is the evidence is not sufficient to constitute substantial evidence under any circumstantial-evidence standard that has ever been stated by this court. Stating that it meets the standard does not make it so.

The jury was placed in an untenable position, and abandoned to either speculate or come to no conclusion. Not surprisingly under the facts they were presented, they convicted Howard. The jury's verdict is not based upon proof of guilt beyond a reasonable doubt. It is not supported by substantial evidence. Howard has been convicted of two murders and sentenced to death twice. Howard was also convicted of attempted capital murder and sentenced thirty years plus a $15,000.00 fine. However, Howard has also been denied fundamental fairness and due process rights guaranteed him under both the United States and the Arkansas Constitutions.

### Facts

The motive for the murders and assault offered by the State was money Howard was expecting from the drug deal, or that Shannon was pregnant by Howard. The persons with whom Brian met on the night of the murders had a great deal more to

gain from the murders and assault, either by making him an example of what happens when a person does not meet his obligations, or in gaining Brian's "white" and keeping their "green" or "stuff."

The record fails to show Howard even knew Shannon thought she might be pregnant by Howard. The record also fails to show that Brian owed Howard money or that Howard showed up with a substantial sum after the murders. The few hundred dollars Jennifer Qualls testified to is hardly the sum Howard was expecting. She specifically testified that he did not have a big "wad" of money after the murders.

What the record does reveal is that Brian and Howard had been involved in drug deals for some time. It also shows that deals had been consummated previously at the Howard farm, which was a suitable secluded location for such endeavors. These deals were not the sale of drugs to users, but rather sales between suppliers.

The record also shows that Brian owed other people money, and that people were mad. He was trying to gather up cash from his users or from anywhere he could get it. Shannon told Kimberly Howard a day or two before her death that Brian owed "Chicken" money, that Chicken had been out to the house three or four times looking for Brian, and that Chicken was mad. Shannon told Kimberly further that "she did not know what Brian was doing with the money but they were going to kill him." Shannon also told a friend that if anything happened to her it would be because of Chicken. Chicken was identified as one of Brian's suppliers. Harvey Hope testified that about a week before the murders, he was at Brian's house and that a white man was there who was driving a white car. Hope testified further that Brian said to the man, "I don't have that kind of money."

Penny Granger testified that Shannon feared for their safety because "Brian owed everybody money and Brian is in over his head." Vicki Howard also testified similarly. Shannon also told Granger that Brian was buying from Pokey Booth, "making dope with Mike May," and getting drugs from Richard McClanahan. Shannon told Granger further that she was worried when he did

not come back from McClanahan's place. Granger also testified that Shannon told her that Brian was digging holes in the back yard and pouring concrete over things. Upon being told of his death, Brian's father told police, "I knew this was going to happen."

Vicki Howard testified that she knew Brian had a deal going down that night and that Howard did not know who he was dealing with. Further, events of the days before the murders show that a deal was to be made at the Howard farm on the night of the murders. There was testimony that in the past, Howard and Brian had done their deals together, but this time Brian had set up his own deal, and although Howard was helping him indirectly, Howard did not know who Brian was dealing with. Granger testified that Shannon told her she and Brian had been to Oklahoma to view drug labs. Phillip Bush testified that a month to three weeks before the murders, he had introduced Brian to a "gentleman" who was looking to trade some "green for some white," which Bush understood to mean marijuana for methamphetamines. Bush further testified that the man was driving a late 80s red Ford pick-up, and that the man returned for another meeting about two weeks before the murders. According to the testimony of Nicole Smith, on the Tuesday before the murders on Friday, she and her mother drove past the Day home, and there was a red Chevrolet pick-up in the drive. She testified that there were two Caucasian men there, and it appeared Brian was in an argument with one of them because there was gesturing and loud talking or hollering.

In the very early hours of Friday morning, Howard met Vicki at McDonald's. She testified that Howard suggested they get a motel room in Texarkana, which they agreed to do. Shortly thereafter, they met at the motel. At this time, Howard was driving the U-Haul truck that was later found at the Howard farm with Brian's body in it. Howard warned Vicki not to tell anyone about the U-Haul because "it would get me killed." The U-Haul was to be used in the deal that night at the Howard farm.

Howard and Vicki then drove to the Howard farm where Howard went out to the shack where they did their deals and

picked something up off the ground. Howard then returned to Kimberly's in Ashdown where he slept on and off that day. At one point Brian came by but did not wake him. The facts are sketchy between 4:00 p.m. and the next morning at 7:30 a.m. when Howard returned. Howard did appear there at about 3:00 a.m. with Shannon and Trevor. And the next day he was in the possession of Shannon's purse.

Brian's body was discovered about 10:00 a.m. Saturday morning Shannon's body and Trevor were discovered several hours later after Brian's body had been removed to the morgue. It is unclear exactly what time they were discovered. However, it is clear that several hours had passed since they were with Howard at Kimberly's apartment.

The evidence does put someone at the Howard farm with Brian the night he was killed. It does not put Howard there. It is unclear where he was. Brian was going to do a drug deal with someone new. The evidence infers it was one or more of the persons Brian had been meeting in the days before the deal. Brian was found dead in the U-Haul that was there for the deal. The evidence puts Howard with Shannon and Trevor at 3:00 a.m. at Kimberly's, and the inference is tht they left with him sometime after that. According to Dr. Kokes, she was murdered sometime between 5:30 a.m. and 1:30 p.m.

There is abundant evidence that all of these people were nervous about something that has never been revealed. After the murders were discovered, Jennifer Qualls met with police at a park because she did not want to go to the police station. According to the officer's testimony, she was shaking so badly that someone had to light her cigarette for her. She did not tell them that she was afraid of Howard, but that she did not want to be seen by anyone from Ashdown, and that she was scared "because a lot of things were going on." That might be argued to infer she was frightened of Howard. The stronger inference is that there was someone else she feared. Prior to the murders, Howard was concerned about being seen, and cautioned Vicki not to talk about the U-Haul. Howard changed cars at least five times on the Friday before the murders, and was picked up in various locations by girlfriends.

In short, the facts are far from reaching substantial evidence. At best, two reasonable hypotheses are raised and neither was proven sufficiently to support a jury verdict. That is not to say this case had to be tried in this posture. Doubtless, further investigation would have helped. Nonetheless, it was tried as it was, and we must review the record presented.

### The Evidence Relied on by the State

A brief discussion of the evidence relied upon by the State is required before I go further. According to the record, Shannon was last seen alive with Howard. On this record that is true, and provides some inference of proximity and time. However, there is nothing in the record about the individual or individuals who met with Brian at the Howard farm about this same time and who likely had been at the Day home on several occasions prior to that night.

Howard had and disposed of Shannon's purse. That raises an inference similar to the one above. His disposal could mean he wanted to dispose of evidence that he had murdered her or that he did not want to be caught with the purse given that someone else had killed her. There was also the money Howard was supposed to be expecting. The evidence was that Howard was to receive $4,500.00 from the deal. Qualls testified Howard gave her $200.00 the next day after the murder, and that he did put some money back in his pocket, but that he did not have a wad of money. It raises but a weak inference if any.

The boots offered into evidence were found several feet from the side of the road and in an open area. Blood on the top of one boot was identified as belonging to Brian. There was testimony that the boots were similar to Howard's boots, testimony that Howard might have been wearing his boots on Friday, and that "Negroid" hairs were found in the boots that were microscopically similar to Howard's. Other Caucasian hairs were found in the boots that were never identified. Most significantly, the boots were found at the side of the road at 8:45 a.m. by a man who testified that there were dew prints of feet in the grass showing someone had walked out of the woods, set the boots out in the

open, and then returned to the woods. When the man walked by at 8:30 a.m., the boots were not there. It was on his return trip that they appeared. In spite of this evidence, the State argued Howard threw the boots from a car. The boots were found side by side consistent with having been placed there. If the State's argument were correct, this would have been a pretty remarkable throw. Also, by 7:30 a.m., an hour and forty-five minutes before the boots appeared, Howard was in town. Also, Howard was wearing the same clothing on Saturday morning as he had been wearing the night before. There was no blood on them. If he had worn the boots, the blood would have been on his pants leg. Dr. Kokes testified that the murder of Brian would have transferred blood, but none was found on Howard's clothes. Too, Howard showed no bruises or other marks, and the evidence was Brian was a fellow who did not back down. Also, Shannon showed defensive marks.

Fingerprints were also relied upon. Prints found on the door to the U-Haul were introduced. That was of no significance. There was abundant testimony that Howard was driving the truck the day before. Fingerprints from a Mountain Dew bottle in the Day home were also introduced. Again, they were of little significance. Howard was a frequent guest in the home. More significant, and still unexplained, were the unidentified fingerprints on the frames that sat atop Shannon's body.

There was evidence that Howard had a .38 caliber handgun. Brian was shot with a .38. No doubt that raises an inference, but the question is how strong an inference given there is probably not a more common caliber than .38. The handcuffs introduced were not similar to the ones found on Brian and Shannon. There is also the tool box purchase. No assertion of relevance is made by the majority. If Howard had the "green" Brian was trading for, he might have wanted the tool box to move it. That would be significant evidence. But there is no such evidence. It was too small to transport a body, and why would he have needed it? He had the U-Haul, which a person of average intelligence would not have left at his own farm with a body in the back of it. One also wonders who called the sheriff to report a U-Haul dripping blood on a remote farm.

I do not dispute this evidence made Howard a proper suspect. I dispute, however, that this constitutes substantial evidence. This case need not have been presented as it was. It appears that once Howard was a suspect, the investigation narrowed and resulted in its present posture. In the words of Hays McWhirter of the Arkansas State Police, "Yes, I continued to work up the case. We continued from the different leads and information we were getting we continued to work to see if anybody else was involved with Mr. Howard."

## Due Process

The majority holds there was both direct and circumstantial evidence linking Howard to the murders. Circumstantial evidence is evidence of circumstances from which a fact may be inferred. *Wilson v. State*, 277 Ark. 43, 639 S.W.2d 45 (1982); *Williams v. State*, 258 Ark. 207, 523 S.W.2d 377 (1975). Direct evidence is evidence that proves a fact without resort to inference, when, for example, it is proved by witnesses who testify to what they saw, heard, or experienced. Fingerprints, which are at issue in this case are circumstantial evidence. *Brown v. State*, 310 Ark. 427, 837 S.W.2d 457 (1992). The blood found on the boots alleged to belong to Howard is also circumstantial evidence. *Hogan v. State*, 281 Ark. 250, 663 S.W.2d 726 (1984).

I am unable to identify any direct evidence in this case, and the majority fails to identify any. The testimony of witnesses involves only the majority's asserted "inappropriate and unexplained" behavior. There is no testimony placing Howard at the murder scenes. This case involves entirely circumstantial evidence.

The majority's primary error is in their analysis with regard to circumstantial evidence. Although the existence of a fact may be proved by circumstantial as well as by direct evidence, the circumstantial evidence must be sufficient to lead to the inference. *Yancey v. State*, 345 Ark. 103, 44 S.W.3d 315 (2001). Where circumstantial evidence is relied upon to establish a fact, the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion. *Id.* There is a great

deal of circumstantial evidence that Howard was at the least indirectly involved in the drug deal with Brian on the night of the murders, and that Howard's whereabouts that night are unclear. That is suspicious but not more.

The State argues that the evidence infers Howard's guilt to the exclusion of all other reasonable hypotheses. He was viable suspect. However, the evidence taken in total shows a substantial drug deal was planned for the night of the murder, and that it was set to take place in the woods on Howard's farm. The evidence also shows that Brian was in serious financial trouble with one or more persons, and that they were angry. Shannon feared for their lives. Others feared for their lives. The evidence shows that Brian was trying to raise money to appease someone. It also shows that Howard and Brian prepared for the deal. The truck was obtained, and the site of the deal was visited beforehand. The person or persons making the deal were there at or near the time of the murder, and they have never been identified.

For a jury verdict to stand in a criminal case, there must be substantial evidence to support it. *Hale v. State*, 343 Ark. 62, 31 S.W.3d 850 (2000). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other without resort to suspicion or conjecture. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002). The majority concludes that the most incriminating evidence in this case was Howard's "inappropriate and unexplainable" behavior. This appears to mean his conduct was suspicious. That the majority so concludes is deducible not only from the use of "inappropriate and unexplainable" in the opinion, but is also equally apparent from the analysis. Still, it is not clear what is meant by "inappropriate." The word generally means "unsuitable." *Webster's Third New International Dictionary* 1140 (1993). What is meant by "unexplainable," is also unclear; however, the term is occasionally used in the context of circumstantial evidence cases where the circumstantial evidence is unexplainable except in connection with the crime charged. *Harshaw v. State*, 275 Ark. 481, 631 S.W.2d 300 (1982). Clearly that cannot be the meaning intended in this case where the evidence is susceptible of a number of different interpretations. This court in *Ayers v. State*, 247 Ark. 174, 177-178, 444 S.W.2d 695 (1969),

quoted 20 AM. JUR. *Circumstantial Evidence* § 1217 where the following is found:

> Where circumstantial evidence is relied upon in a criminal prosecution, proof of a few facts or a multitude of facts all consistent with the supposition of guilt is not sufficient to warrant a verdict of guilty.

No matter how suspicious, inappropriate, or unexplainable the behavior may be, it will not support a jury verdict. This court has stated more than once with regard to suspicion and circumstantial evidence and its inferences that where inferences are relied upon, they should point to guilt so clearly that any other conclusion would be insufficient. *Hodge v. State*, 303 Ark. 375, 797 S.W.2d 432 (1990); *Ravellette v. State*, 264 Ark. 344, 571 S.W.2d 433 (1978). This court went on in these two opinions to state that this is so regardless of how suspicious the circumstances are. *Hodges, supra; Ravellette, supra.* Almost fifty years ago, in a time argued by some to be far less enlightened than our own, this court stated quite bluntly:

> The rule is forcibly stated by the Supreme Court of Virginia in the case of *Dotson v. Commonwealth*, 171 Va. 514, 199 S.E. 471, at page 473, in this language: "From the facts shown, no reasonable inference of guilt can be deduced which will be equivalent to proof of guilt beyond a reasonable doubt which is always necessary. Where inferences are relied upon to establish guilt, they must point to guilt so clearly that any other conclusion would be inconsistent therewith. This is true no matter how suspicious circumstances may be."

*Williams v. State*, 222 Ark. 458, 463, 261 S.W.2d 263 (1953). *See also, Bowie, supra.* Where the evidence does not meet the required standards, the jury verdict will be overturned. *Phillips v. State*, 344 Ark. 453, 40 S.W.3d 778 (2001). Where the evidence offered only raises suspicion and the jury would thereby be left to decide based upon speculation and conjecture, then the directed verdict motion should be granted. *Nichols v. State*, 280 Ark. 173, 655 S.W.2d 450 (1983). Conjecture and speculation, however plausible, can not be permitted to supply the place of proof. *First Electric Cooperative Corp. v. Pinson*, 277 Ark. 424, 642 S.W.2d 301 (1982);

*Kapp v. Sullivan Chevrolet Company*, 234 Ark. 395, 353 S.W.2d 5 (1962); *Russell v. St. Louis S.W. Ry. Co.*, 113 Ark. 353, 168 S.W. 135 (1914). Where a jury verdict is the result of chance and surmise, as in this case, the decision will be subject to a *habeas corpus* review in federal court. A conviction based upon insufficient evidence violates due process under the Fourteenth Amendment. *Jackson v. Virginia*, 443 U.S. 307 (1979).

Just last year, this court stated in a case relying on circumstantial evidence, "Upon review this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict." *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). *See also, Fudge v. State*, 341 Ark. 759, 20 S.W.3d 315 (2000). This is not surprising because obviously guilt in a criminal case must be based upon proof beyond a reasonable doubt. Long ago in *Williams v. State*, 222 Ark. 458, 463, 261 S.W.2d 263 (1953), we discussed that any inference of guilt deduced from circumstances must be equivalent to proof of guilt beyond a reasonable doubt, which is always necessary. *Williams, supra. See also Jackson*, 443 U.S. at 317-318. Where such inferences are relied upon, they must point to guilt so clearly that any other conclusion would be insufficient. *Hodge, supra; Ravellette supra.*

Two primary errors were committed. The first was committed when the trial court denied the motion for a directed verdict and submitted the case to the jury because it is only when the evidence is substantial, rises above suspicion, and is properly connected, and the jury is therefore not left to speculation and conjecture, that it may be submitted to the jury to determine whether the evidence excludes every other reasonable hypothesis. *McDole v. State*, 339 Ark. 391, 6 S.W.3d 74 (1999). The jury verdict should be overturned by this court on this basis. The second error is made by the majority on review of the jury verdict, which they must review to determine whether the jury resorted to speculation and conjecture in reaching its verdict. This analysis is nowhere in the majority opinion.

After reading the briefs, abstract, and record, the majority's opinion seems rather meager. It stretches and reaches to assert unsupported conclusions. In large part this is so because in the

analysis, the lives of Howard, Brian, Shannon, and Trevor Day are deftly lifted and separated from a virtual cesspool of crime teeming with any number of vermin who quite likely had both cause and motive to harm Shannon and Brian, as well as Howard and others. However, in this way, Howard and the Days can be viewed in isolation, and therefore the facts are not too difficult. However, if this case is viewed as it ought to be, the record we have received is hopelessly complicated, and to dive into the facts of all the witnesses is to nearly drown in a nether world of any number of threats, of drug dealers dealing one drug for another, of trips to other states to view other drug operations, of mysterious unidentified out-of-state drug dealers, of such fear among witnesses that they are careful not to be seen by anyone talking to the police. The most reasonable hypothesis that the evidence will support is that Brian was trying to do a deal with those to whom he was deeply indebted, and it went bad. He and his family may well have been made examples — examples that might have even convinced Howard to keep quiet. We do not know who those people were, but there is evidence that they were there that night when Brian was murdered. This case fails because of a lack of proof offered by the prosecutor. Howard may well be the murderer, but the evidence presented is insufficient.

This is the court of last resort for many issues. Fundamental due process issues have been presented to us. As we quoted in *Bowden v. State*, 256 Ark. 820, 822, 510 S.W.2d 879 (1974), this "'. . . . inescapably imposes upon this court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English speaking peoples even toward those charged with the most heinous offenses." *Malinski v. New York*, 324 U.S. 401 (1945), *cited in Rochin v. California*, 342 U.S. 165 (1952)." The jury verdict should not stand.

### Motion to Suppress

This case could also be reversed and remanded for a new trial based upon the trial court's error in denying the motion to suppress certain testimony by Penny Granger. The majority recites the events at trial involving the admission of the testimony of

Penny Granger regarding a statement that Shannon told her that she might be pregnant by Howard. The majority then states the law that admission of evidence showing motive is left to the discretion of the trial judge, and then fails to provide any analysis, or even a statement as to any conclusion reached. The majority just passes on the issue. The trial court erred when it denied the motion to suppress.

Penny Granger testified that she was present when Shannon performed an at-home urine test for pregnancy. She further testified that upon seeing the "stick" was a color indicating pregnancy, she told Penny, "Oh, no, Brian's going to be mad." Granger testified that she asked Shannon why Brian would be mad, and she purportedly told Granger that there was a "possibility that it could be Tim Howard's baby."

There was no evidence that Howard ever knew Shannon thought she might be pregnant with his child. The autopsy failed to show any evidence of pregnancy. Nonetheless, the majority finds no problem with allowing the evidence to be admitted to show why Howard might have killed Shannon. This is mere speculation. There is no evidence showing that Howard possessed any knowledge of this and thereby could have killed her for this reason. It is rank speculation.

This court has declared for over seventy years that inferences may not be drawn from inferences, because that would "carry the deduction into the realm of speculation and conjecture." *Moran v. State*, 179 Ark. 3, 7, 13 S.W. 828 (1929). *See also, Yancey, supra.* Here, two inferences are required. We must first infer that Howard knew Shannon believed she was pregnant by Howard, and then infer he killed her because of that knowledge. Such a deduction is not allowable under the rules of evidence. *Yancey, supra.*

Nor could the evidence withstand an analysis under relevance. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Ark. R. Evid. 401. *McDole, supra.* The fact that is of consequence is who murdered Shannon. The evidence is that Granger knew Shannon thought Howard

might have gotten her pregnant. If the evidence was that Granger told Howard that Shannon thought she was pregnant with his child, then the evidence might make it more rather than less probable that Howard killed Shannon because he thought she was pregnant with his child. It would be evidence of motive. There is no evidence Howard was aware of Shannon's belief. Without some evidence showing Howard possessed knowledge that Shannon believed she was pregnant by him, the evidence is not relevant and simply has no probative value to the fact of consequence.

Even if relevance is ignored for the sake of argument, the probative value of the evidence is very weak when compared to the prejudicial impact. Ark. R. Evid. 403. The evidence at most raises an inference that if Howard knew Shannon believed she might be pregnant by him, it could be a motive to kill her. On the other hand, Howard, an African-American, was tried for the capital murder of a white woman. Then, by Granger's testimony, the jury is told that he might have gotten her pregnant as well. The obvious potential prejudice is so apparent it needs no discussion. Additionally, there is prejudice in the likely result that the jury may well have believed Howard may also have killed the fetus. And yet despite all this, the majority finds no error at all in denying the motion to suppress.

### Closing Argument in the Penalty Phase

In arguing for the death penalty, the prosecutor entered the realm of fantasy, and according to the majority, that is not reversible error. It is hard to imagine a more sickening image than the one painted by the State's attorney in closing argument when he invited the jury to visualize a helpless mother, bound, and compelled to watch as her infant son is hanged by an extension cord before her very eyes. If this were true, it would be helpful to the jury in deciding punishment, but unfortunately, it is the product of the fantasy of the State's attorney. The majority holds that this was "plausible," or, in other words, it was not impossible that it might have occurred. Plausibility is not the standard. It is every plausible inference that may be argued, not every possible course of events. While there is no question Trevor was strangled, there

are no facts which would support any inference that he was hanged, or that he was hanged before his mother's eyes.

The closing argument was based upon pure fiction. There is no basis in the record. A prosecutor acts in a *quasi*-judicial capacity, and it is the prosecutor's duty to seek a fair and impartial trial. *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999). As the United State Supreme Court noted in *Berger v. United States*, 295 U.S. 78 (1935), the prosecutor is not the representative of an ordinary party, but of a sovereignty whose obligation is to govern impartially. This court's holding in *Holder v. State*, 58 Ark. 473, 25 S.W. 279 (1894), has been cited often, last in *Leaks, supra.*, wherein this court stated:

> Nothing should tempt him to appeal to prejudices, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce him to endeavor to obtain a verdict by arguments based on anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same. To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man. The forms of law should never be prostituted to such a purpose.

*Leak, supra*, 339 Ark. at 358.

The majority holds that the argument "Shannon Day saw her child hanging from an extension cord before she died" is a fair inference from the evidence. I must ask from what evidence this inference arises? The child was not even found in the same room as Shannon's body. There was no evidence to show what occurred in that home. There was only evidence that the child was strangled, not that he was hanged. And there was no evidence to show whether Shannon was assaulted first, or whether the child was assaulted first, or, for that matter, where within the home the assaults occurred. The State's attorney was not going beyond the record to argue evidence that he thought should have been admitted. Instead, he testified to fictional facts. This is a serious problem that calls the very legitimacy of the trial into question.

The State's attorney did not argue facts or inferences from facts in the case. He introduced facts by way of argument. By so doing, the State's attorney deprived Howard of his right of cross-examination of the witness, the State's attorney. LaFave, *Criminal Procedure* § 24.7(e), at 555 (1999). This was not evidence. It was pure speculation and conjecture. The jury heard it and considered it in deciding on the death penalty. The sentence is subject to attack on the basis that death was imposed in an arbitrary and capricious manner. In *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999), we stated that we recognized that there must be adequate power in the judiciary to check the arbitrary and capricious imposition of a death sentence, noting that in *Collins v. State*, 261 Ark. 195, 548 S.W.2d 106 (1977), we held that those safeguards existed in Arkansas and stated:

> The Arkansas judiciary is vested with broad powers to check the arbitrary, capricious, wanton or freakish imposition of the death sentence by a jury. Those powers exist at both trial and appellate levels.

*Robbins*, 339 Ark. *at* 348. This court can not say that the death penalty was imposed based upon the evidence in this case. We have a duty to guard against precisely what occurred in this case.

No objection was made. That is of no moment. We anticipated this very situation in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), when we stated:

> A third exception is a mere possibility, for it has not yet occurred in any case. That relates to the trial court's duty to intervene, without an objection, and correct a serious error either by an admonition to the jury or by ordering a mistrial. We implied in *Wilson v. State*, 126 Ark. 354, 190 S.W. 441 (1916), that no objection is necessary if the trial court fails to control a prosecutor's closing argument and allows him to go too far: "Appellant can not predicate error upon the failure of the court to make a ruling that he did not at the time ask the court to make, unless the remarks were so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury not to consider the same. *See Kansas City So. Ry. Co. v. Murphy*, 74 Ark. 256 [85 S.W. 428 (1905)]; *Harding v. State*, 94 Ark. 65 [126 S.W. 90 (1910)]."

This case presents precisely this situation. The argument was beyond flagrant. Howard's right to a fair and impartial trial was fatally compromised. This case should be reversed and remanded on this basis for resentencing.

I also think it worthy of note that by our *per curiam* dated July 9, 2001, Ark. R. App. P.—Crim. is being amended for cases where the death penalty is imposed on or after August 1, 2001. Thereby, the issues to be reviewed by this court are expanded to include:

> iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;

* * *

> vii) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

### The Handcuffs

Finally, I must dissent on the majority's holding that admission of the handcuffs was not an abuse of discretion. The handcuffs found on Brian and Shannon Day's bodies were simply metal handcuffs. The pair of handcuffs Jennifer Qualls testified that she saw in the possession of Howard were fur covered and intended for a sexual purpose. Based upon information from Quall, the State went to the store where Howard was believed to have acquired his and purchased a pair thought to be similar. The purchased pair had fur on them.

The State moved to admit these purchased hand cuffs and they were admitted over objection. There was no evidence linking Howard to the handcuffs found on Brian and Shannon. There was no evidence Howard possessed two pair. The handcuffs on Shannon and Brian had neither fur nor any glue residue. In short there was no similarity beyond the fact all three pairs of handcuffs were handcuffs of one form or another.

Because handcuffs were found on Shannon and Brian, an argument may be made that Howard having handcuffs in his posssession prior the murders is relevant as having some tendency to make it more likely Howard was connected to their murders. Ark. R. Evid. 401. However, under Ark. R. Evid. 403, the court must weigh the probative value against the prejudicial harm. Here the likelihood the handcuffs on the victims came from Howard is lessened by the fact they are so dissimilar to those Qualls testified to. Further, the pair Qualls testified to were not the ones admitted, but rather a pair purchased that were thought to be similar. This lessens the relevance and heightens possible prejudice even more. In the end, the probative value is slight and the potential harm is great. Under Rule 403 the

handcuffs should have been excluded. On this basis, this case should be reversed and remanded for a new trial.

The majority's states the law on admission of evidence and then simply states a conclusion that there was no abuse of discretion in admitting the handcuffs. There is no analysis of why the handcuffs were or were not properly admitted.

For the foregoing reasons, I respectfully dissent.

## SUPPLEMENTAL DISSENTING OPINION ON DENIAL OF REHEARING

### June 27, 2002

JIM HANNAH, Justice, dissenting. The petition for rehearing should be granted. The majority has stated and relied upon the wrong standard of review in this case. The majority states that under the standard applied, "Only evidence supporting the verdict will be considered." This statement is overbroad. Rather, under the requirements of the Fourteenth Amendment to the United States Constitution, *all* the evidence is reviewed in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307 (1979), *see also, Lewis v. Jeffers*, 497 U.S. 764 (1990). We have said as much earlier in *Chaviers v. State*, 267 Ark. 6, 588 S.W.2d 434 (1979), wherein this court stated:

> In pointing out the pertinent testimony on the question of sufficiency of the evidence, we will view the evidence in the light most favorable to the state, considering only that testimony that lends support to the jury verdict and disregarding any conflicting testimony which could have been rejected by the jury on the basis of credibility.

*Chaviers v. State*, 267 Ark. *at* 13. Here the standard was correctly stated. *All* evidence must be considered in the light most favorable to the state; however, testimony that could have been rejected by the jury on the basis of credibility may be disregarded. This is consistent with the well known principle that the court will generally defer to the jury on issues of credibility. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002); *Phillips v. State*, 344 Ark. 453, 40 S.W.3d 778 (2001). *See also, Schlup v. Delo*, 513 U.S. 298 (1995). Consistent with these rules, all evidence in favor of the appellant may not be

simply disregarded. Thus, this court has ignored evidence on review that must be considered.

The injury that results from this improper standard is seen quite clearly in this case based solely upon circumstantial evidence. The majority states in error that this case includes direct evidence. As discussed in my dissent, there is no merit to this assertion. The majority asserts as well that the determination of whether the circumstantial evidence is consistent with guilt and inconsistent with any other reasonable conclusion is a question of fact for the fact-finder to determine. This is again overbroad and ignores an analysis that should have been undertaken by the trial court and ignores an analysis that should have been undertaken by this court on appeal.

The trial court may not simply default to the jury. This court may not simply assert the issue is one for the jury and ignore whether the trial court should have submitted the issue to the jury. In *Jackson, supra,* the United States Supreme Court stated that:

> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. *at* 317. More is required than simply a "trial ritual." *Jackson v. Virginia,* 443 U.S. *at* 316-317. It is only when circumstantial evidence does more than arouse suspicion, and is properly connected, that it becomes an issue to be submitted to the jury. *Sanders v. State,* 340 Ark. 163, 8 S.W.3d 520 (2000); *Chaviers, supra.* *See also, Harshaw v. State,* 275 Ark. 481, 631 S.W.2d 300 (1982). An analysis is required to determine whether the jury was left to speculation and conjecture in arriving at its conclusion. *Chaviers, supra.* Only then is the question one that may be submitted to the jury. In *Ross v. State,* 346 Ark. 225, 230, 57 S.W.3d 152 (2001), this court stated, "Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict." This was not done. Due process was not satisfied.

The majority attempts to meet the requirement that the circumstances be so connected and cogent as to show guilt to a moral certainty with the statement that "the most incriminating evidence against Howard was his inappropriate and unexplainable behavior both before and after the discovery of Brian, Shannon and Trevor

Day." How inappropriate and unexplainable behavior rises above mere suspicion and conjecture is difficult for me to understand.

I also feel compelled to note that the reference to "inappropriate and unexplainable behavior" might be interpreted to mean that this court is stating that if Howard had an explanation for his behavior, he should have provided it. While it is not clear, this might be argued to mean that this court is indicating he should have waived his Fifth Amendment rights against self-incrimination and provided testimony to explain his conduct. Clearly, this would not be proper. The jury is instructed that a defendant has an absolute right not to testify. The jury is further instructed that the fact a defendant chooses not to testify is not evidence of guilt or innocence, and under no circumstances shall the jury consider whether the defendant testified. AMCI Crim. 111. Yet it appears this is what is being considered by this court.

Based upon the arguments stated herein, and based on the arguments contained in my dissent, I would grant the petition for rehearing.

BROWN and THORNTON, JJ., join.

CORBIN, J., not participating.